## HARRIS v. PENNSYLVANIA RAILROAD CO.

### No. 3158.

Circuit Court of Appeals, Fourth Circuit.

June 17, 1931.

D. Arthur Kelsey, of Norfolk, Va. (Kelsey & Jett, of Norfolk, Va., on the brief), for appellant.

T. H. Willcox, Jr., of Norfolk, Va. (Willcox, Cooke & Willcox, of Norfolk, Va., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and ERNEST F. COCHRAN, District Judge.

SOPER, Circuit Judge.

An action at law was brought in the District Court by Minnie C. Harris, administratrix of the estate of Ernest L. Harris, against the Pennsylvania Railroad Company, to recover damages for his death on September 29, 1929, while in the defendant's employ as a deck hand on a car float of the defendant then engaged in transporting certain railroad cars from Cape Charles to Little Creek, Va. The action was instituted under the provisions of section 33 of the Merchant Marine Act of 1920 (46 USCA § 688), wherein it is provided that in case of the death of a seaman, as the result of an injury in the course of his employment, his personal representatives may maintain an action for damages, and, in such action, all statutes of the United States conferring or regulating the right of action for death in case of railway employees shall be applicable. The Federal Employers' Liability Act (section 1 [45 USCA § 51]), is such a statute, and provides that every common carrier by railroad shall be liable in damages in case of death of the employee resulting in whole or in part from negligence of any of the officers, agents, or employees of the carrier. The gist of the action is that the death of Harris was the direct result of negligence on the part of the officers and agents of the defendant, engaged as fellow members of the crew with him at the time of his death.

Harris was 31 years of age, and, until three days before the accident, had been employed in a clerical capacity. On September 26, 1929, he was engaged by the defendant as a deck hand; and on the night of September 29, 1929, was drowned while engaged in the performance of his duties on a car float which was in tow of one of the defendant's tugs. The float was 348 feet in length by 47.9 feet beam. She carried a crew of seven, of whom James A. White, the mate, W. A. Sparrow, the fireman, and Harris, the deceased, were on duty. The mate was in command of the vessel, and, at the time of the accident, was standing in the pilot house of the float which was located on an elevated bridge or structure above the main deck about the center of the vessel. From his station in the pilot house, he had a view of the main deck of the vessel, fore and aft. He was able within a few seconds to step from the pilot house to the side of the vessel, a distance of some 25 feet.

The flotilla had left Cape Charles in tow of the tug at 5:45 p. m., and had arrived at

the entrance to Little Creek about 8:45 p. m. When it reached this point, a signal was received from the tug to cast off from the bow of the barge the steel hawser by which she was being towed. This maneuver was necessary in order that the tug might come along side the starboard side of the car float and be made fast to her, and proceed thence to the landing. It was the duty of Harris to cast off the hawser from the bow of the float. He had been joined by the fireman, Sparrow, who had come on deck in order to show Harris how to make fast the lines from the tug when she came along side, and also for the purpose of receiving the stern line from the tug and attaching it to the float. After the tow line had been cast off, Harris and Sparrow walked aft on the vessel from her bow to a cleat on her starboard side, situate about one-half the distance between the bow and the bridge. Sparrow instructed Harris to fasten the bow line of the tug to this cleat when the tug should come along side of it, and then went aft on the starboard side of the car float to receive the stern line from the tug. When he arrived at a point about amidships, he heard a cry, and looking back saw Harris going into the water feet first with the lantern which he had been carrying still in his hand. Sparrow called out to the tugboat "man overboard" so as to stop her from coming back upon Harris. Harris came up from beneath the water at a point about 25 feet aft of Sparrow, as the latter stood amidships. The barge at the time was going ahead about 3 or 3½ miles per hour. Harris called out two or three times "throw me a line." Sparrow testified that he went aft on the barge as quickly as he could and when he arrived at the stern, he picked up a 6-inch hawser and threw it toward the man in the water. At that time Harris was seen about 50 feet astern of the float. The hawser was so heavy that the fireman could not throw it more than 10 feet. Nearby there lay upon the deck a heaving line, estimated to be probably about 6 fathoms or 48 feet in length which could have been thrown much more easily, but the fireman failed to use it. Harris was an expert swimmer, and, after he reappeared on the surface of the water, he seemed to be swimming or treading water.

No other effort was made to throw a line or other device to Harris while he was in the water. When Sparrow called out "man overboard," the mate stepped out of the pilot house and walked across to the starboard side of the boat, and, looking over the side, saw some bubbles which might have indicated that some one had fallen in. He testified that he had some conversation with Sparrow as to the whereabouts of the man overboard, but this testimony is not substantiated by Sparrow. There was a life buoy kept near the pilot house which White could have secured and thrown into the water in 3 or 4 seconds, but he made no attempt to do so, and, not seeing Harris in the water, he walked back into the pilot house after a couple of minutes without further ado. His explanation is that it was necessary for him to be in the pilot house as the flotilla was approaching certain bridges 400 or 500 yards away. It seems clear, however, that irrespective of this duty, it would have been easy for him to have thrown a buoy or life ring upon the water during the period while he was at the starboard side of the ship.

In the meantime, the tug backed toward the spot where Harris had fallen overboard, and certain members of the crew called out and were ready to throw a life line or life belt to him, but, not seeing him, nothing was done. After staying at the point of the accident some ten minutes, the tug proceeded with the car float to the dock. Several days later Harris' body was found on a neighboring shore about 50 yards from where he was last seen in the water.

At the close of the plaintiff's case in the trial below, the defendant made a motion for a directed verdict in its behalf, which was granted by the district judge. He held, in effect, that it was the duty of the defendant railroad company to exercise reasonable diligence to save the deceased after it was ascertained that he was in danger of his life; but that even if it could be said that there was a lack of such diligence on the part of the mate and the fireman to do all that was reasonably possible to save the drowning man by throwing lines or buoys into the water, nevertheless there was no evidence from which the jury could reasonably conclude that more diligent action on their part would have saved their comrade's life. The judge thought that even if additional steps had been taken, it was still merely a matter of speculation as to whether the deceased would have been able to have availed himself of them so as to be saved. See New York Cent. R. Co. v. Grimstad (C. C. A.) 264 F. 234, where a similar decision was made.

Two main questions are presented by the argument of counsel: (1) Whether when the seaman fell overboard by reason of his own misfortune or carelessness, and without negligence on the part of any other member of the

crew, the defendant owed him a duty to rescue him from his peril; and (2) if this duty be found to exist, whether there was negligence on the part of the crew in failing to perform it. The defendant contends that if a seaman falls overboard from his ship through his own neglect or misfortune, and without negligence on the part of the vessel contributing, no legal obligation exists on the part of any one on board to attempt to rescue him from his peril; from a legal standpoint, he may be left to die with impunity. No direct authority is cited for this position, but it is suggested that the relationship of a seaman to the owners of his ship is governed by the well-known rules of the law of master and servant, and cases are cited which hold that an employer, free from negligence, is not required to furnish medical care and attention to an employee who becomes ill or is injured in the course of his work. See Union Pacific Ry. Co. v. Cappier, 66 Kan. 649, 72 P. 281, 69 L. R. A. 513 note; Allen v. Hixson, 111 Ga. 460, 36 S. E. 810; Virginia Iron, Coal & Coke Co. v. Odle's Adm'r, 128 Va. 280, 105 S. E. 107. The authorities, however, even as to nonmaritime occupations, are not uniform, and some hold that in hazardous employments, there is a tacit understanding existing between the parties that if an employee is so injured in the course of his employment that he cannot care for himself, the employer, in the emergency, will furnish him with the necessary treatment. Hunicke v. Meramec Quarry Co., 262 Mo. 560, 172 S. W. 43, L. R. A. 1915C, 789, Ann. Cas. 1915D, 493; Raasch v. Elite Laundry Co., 98 Minn. 357, 108 N. W. 477, 7 L. R. A. (N. S.) 940.

We are referred to no decisions involving the bald question presented in the case at bar, although cases are cited in which the negligent failure of a ship's crew to save a drowning seaman has been treated as a material circumstance in determining the obligation of the vessel. See Salla v. Hellman (D. C.) 7 F.(2d) 953; Newport News S. B. & D. D. Co. v. Watson (C. C. A.) 19 F.(2d) 832, 833. But we have no doubt that a legal obligation rests upon a ship to use due diligence to save one of the crew, who, by his own neglect, falls into the sea; and that the owners are liable if, by failure to perform this duty, his life is lost. The reason is apparent when we consider the peculiar relationship of the seaman to his ship, which, irrespective of statute, has been recognized from the earliest period. The general rules of master and servant apply, but they are modified by the nature of the business. The contract of employment involves not merely a surrender of the personal liberty of the seaman to a greater extent than is customary, Robertson v. Baldwin, 165 U. S. 275, 17 S. Ct. 326, 41 L. Ed. 715, but it imposes upon the employer an exceptional obligation to care for the well-being of the crew.

There is no other peaceful pursuit in which the dominion of the superior is so absolute and the dependence of the subordinate so complete, as in that of a sailor upon a vessel at sea. He binds himself by the contract of employment to serve the ship during the voyage, and desertion may be made an offense punishable by imprisonment. He owes obedience while on shipboard to his superior officers, and is bound to execute their lawful commands even at the risk of danger to his person or his life; and their right to enforce obedience by proper discipline and punishment has been recognized. If he is taken sick or is injured on board the ship, or is cast into the sea by the violence of the elements or by misfortune or negligent conduct, he is completely dependent for care and safety upon such succor as may be given by the members of the crew. By reason of these conditions, the maritime law extends to mariners a protection greater than is afforded by the general rules of common law to those employed in service upon the land. From time immemorial, seamen have been called the "wards of admiralty"; and in this country as elsewhere the Legislature has enacted an elaborate system of legislation for their protection. Regardless of legislation, it is uniformly recognized that it is the duty of a vessel to care for a seaman who is taken sick or receives an injury on a voyage in the service of the ship, to the extent of providing medical care and attendance, and, if possible, a cure at the expense of the ship. And it is even required, where a serious accident occurs, that the master shall exercise a reasonable judgment as to putting into the nearest available port, in order that proper treatment may be secured. The Osceola, 189 U. S. 175, 23 S. Ct. 483, 47 L. Ed. 760; The Iroquois, 194 U. S. 240, 24 S. Ct. 640, 48 L. Ed. 955; The Kenilworth (C. C. A.) 144 F. 376, 4 L. R. A. (N. S.) 49, 7 Ann. Cas. 202. Equally clear is the obligation upon the part of the ship to save the life of a sailor who falls overboard through a misadventure, not uncommon in his dangerous calling. It is absurd to admit the duty to extend aid in the lesser emergency, and to deny it in the greater. In both cases, it is implied in the contract

that the ship shall use every reasonable means to save the life of a human being who has no other source of help. The universal custom of the sea demands as much wherever human life is in danger. The seaman's contract of employment requires it as a matter of right.

■ We think also that the evidence was sufficient to justify the submission to the jury of the issue of negligence. The jury might well have concluded that a greater degree of diligence should have been exercised by the mate in charge of the vessel and by the fireman on the deck at the time. The deceased was an expert swimmer, and, when he came to the surface of the water, he was swimming or treading water. He called out several times for the men on the barge to throw him a line. At this moment or shortly thereafter, the mate arrived at the side of the ship in close proximity to a life ring, but made no effort to throw it into the water because he could not see the man overboard. The mate knew that the man had just gone overboard, and it should have been obvious to him that the very occasion existed for which life rings are made and used. The fireman also, although making an effort in his excitement to throw overboard a 6 inch hawser which one man could not readily handle, failed to make any effort to use the heaving line nearby which he could easily have managed. It is true that the heaving line was only about 50 feet long and when the hawser was thrown, Harris was already 50 feet from the stern of the vessel which was then slowly going ahead. But it is not easy to understand, notwithstanding the testimony of Sparrow to the contrary, why he could not have reached the stern of the vessel before it passed the man in the water. The vessel was only moving at the pace of an ordinary pedestrian, and an able-bodied seaman should have had no difficulty in reaching the stern before the vessel passed the man struggling in the water. The jury was not obliged to accept his opinion that he went aft as soon or as fast as he could.

These obvious facts lead us to conclude that there was evidence of neglect on the part of the crew, and further that it was for the jury to decide whether the man could have been saved if due diligence had been used. The deceased, even when last seen, was within 200 feet of the point at which a life ring, if promptly thrown, would have rested on the surface of the water. He was evidently making every possible effort to save himself. Whether in any event he would have succeeded is not a certainty, but in our view there was enough testimony tending to show a reasonable probability of rescue, had a life ring or heaving line been used, to justify the submission of the question to the jury.

Reversed.