## KIRINCICH v. STANDARD DREDGING CO.

### No. 7186.

Circuit Court of Appeals, Third Circuit.

May 3, 1940.

Howard S. Tilton, of Camden, N. J., Silas B. Axtell, of New York City, and Dominick Blasi, of Brooklyn, N. Y., for appellant.

Howard M. Long, of Philadelphia, Pa., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

We think it fair to say that the resolvement of the case at bar depends upon the judicial stigmatism of the court deciding it. The learned district judge and ourselves are required to appraise facts in relation to, first, causation and, second, a standard of care. Our appraisal happens to differ with his and we find the same difference elsewhere in the "books". It is an application of facts to a point of view. We should begin, therefore, with a statement of those facts.

Libelant's intestate was a deck-hand employed on the dredge of the respondent. That dredge was, at the time of the fatal accident sued upon, engaged in cutting the "interior channel" in the neighborhood of Ft. Lauderdale, Florida. The dredge crew was working in two shifts and part of the accordingly large number lived on a "quarter-boat" tied up to the shore between piers. These piers seem to have served as a sort of base for the dredging operation.

About four o'clock on the morning of February 19, 1933, a small diesel-engined launch towed two barges or scows from the dredge to the shore base. The barge next the launch and attached to it by a towing bridle was loaded with lengths of the pipe used in the dredging and behind it and lashed to it stern foremost was a barge on which was a derrick (for unloading the pipe) and an engine to operate it. The launch had five lights (two ordinary navigating) and the derrick barge an unspecified number of kerosene lanterns. The dawn had not yet lightened the darkness.

Kirincich and two other deck-hands (one in a supervisory capacity) were on the rear of the derrick barge as the two approached the pier. The supervisory deck-hand ordered the other deck-hands to proceed to the corners of the barges in readiness for making them fast. As the two slowed up in the calm water between the piers cries for help were heard and the libelant's intestate was seen to be in the water (depth 35 feet) 20 yards or so from the end (bow) of the derrick barge. The tide was running out, he was carried with it, and finally disappeared with a last tragic "Goodby fellows". At the first cries each of the deck-hands instantly threw heaving lines (1 inch diameter) in his direction. They repeated their casts three times and came once and with one line within two feet of the spot where he was struggling in the water. He never grasped the lines and his body was recovered some hours later.

The launch was cut loose from the tow and turned around in a vain effort to find the drowning man. On the shelf in front of its wheel were several life preservers of the standard type familiar to all who travel on marine craft from ferry-boats up. These remained in their racks and the personnel of the tow and launch remained in none too glorious safety.

■ All these facts are undisputed. The only disagreement concerns, first, the irrelevance of how the deceased came to fall into the water anyway, and second, the controverted question of his ability to remain afloat after he had done so. As there is no substantial suggestion of suicide, it is immaterial whether he carelessly slipped, or, as his mess boy friend waiting on the dock said, whether a careless bump precipitated him. To the duty of rescue there is no defense of contributory negligence. Harris v. Pennsylvania Railroad Co., 4 Cir., 50 F.2d 866, 868.

The variable evidence raises an issue only dimly sensed by counsel. We say only dimly because we gather it from their citations rather than from their argument. Before we reach the complexities of "proximate cause", we encounter the requirement of causation in its logical sense. This requirement finds one expression in the "But-for" or "Would have happened anyway" rule. Professor Beale phrases it in this wise: "Where the act is the failure merely of a legal duty, causation is established only when the doing of the act would have prevented the result; if the result would have happened just as it did whether the alleged actor had done his duty or not the failure to perform the duty was not a factor in the result, or, in other words did not cause it." Beale, The Proximate Consequences of an Act, 33 Harvard Law Review 633, 637. See, also, Smith, Legal Cause in Actions of Tort, 25 Harvard Law Review 103, 109; McLaughlin, Proximate Cause, 39 Harvard Law Review 149, 153, 154; Hirschberg, The Proximate Cause in the Legal Doctrine of the United States and Germany, 2 Southern California Law Review 207, 211, 212, 217; cf. v. Liszt-Schmidt, Lehrbuch des Strafrechts; Max Ludwig Mueller, Die Bedeutung des Kausalzusammenhanges.

■ The stock illustrations of the writers are: the child running in front of the horses whose reins were carelessly out of the driver's hands, Regina v. Dalloway,

2 Cox C.C. 273; and the runaway horses going through an obligatory fence not strong enough to stop them anyway, Sowles v. Moore, 65 Vt. 322, 26 A. 629, 21 L.R.A. 723. Nearer to our own facts, Professor Beale cites a case where the mate fell from the defendant's vessel, never arose to the surface, and the ship's boat was negligently lashed to the deck, Ford v. Trident Fisheries Co., 232 Mass. 400, 122 N.E. 389. In the light, then, of this logic and these examples, would Kirincich have drowned even if a larger and more buoyant object than the inch heaving line had been thrown within two feet of him? If he could swim, even badly, there would be no doubt. Assuming he could not, we think he might (the appropriate grammatical mood) have saved himself through the help of something which he could more easily grasp. We can take judicial notice of the instinct of self-preservation that at first compensates for lack of skill. A drowning man comes to the surface and clutches at what he finds there—hence the significance of size and buoyancy in life saving appartus. In other words, we prefer the doctrine of Judge Learned Hand in the case of Zinnel v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 10 F.2d 47, 49: "There of course remains the question whether they might have also said that the fault caused the loss. About that we agree no certain conclusion was possible. Nobody could, in the nature of things, be sure that the intestate would have seized the rope, or, if he had not, that it would have stopped his body. But we are not dealing with a criminal case, nor are we justified, where certainty is impossible, in insisting upon it. * * * we think it a question about which reasonable men might at least differ whether the intestate would not have been saved, had it been there." to that of his colleague, Judge Hough, dissenting in that case, and concurring in the earlier case of New York Central R. Co. v. Grimstad, 2 Cir., 264 F. 334, 335. See, also, Harris v. Pennsylvania Railroad Co., 4 Cir., 50 F.2d 866, 869.

In appraising care we are faced, as in another and recent decision, Cawman v. Pennsylvania Seashore Lines, 3 Cir., 110 F.2d 832, with the prescription of a standard of equipment. In the case at bar, the prescription is entirely ours (not a jury's) and so is (subject to certiorari) final. We asserted there, and we reiterate here, our view that the emphasis should be for life

and against property. In some fields and in some philosophies of ruggedness that has been disputed. It can hardly be maintained in the face of the absurdly simple precautions here contended for. Those precautions focalize on what amounts to the degrees of specific gravity. We can concede no importance to the particular type of "buoyant apparatus", as the English Safety and Load Line Conventions Act has it, 22 Geo. 5, c. 9, 25 Halsbury's Laws of England 631–638. The cases do not, and common sense does not, distinguish among life boats, life preservers and life rings, Newport News Shipbuilding & Dry Dock Co. v. Watson, 4 Cir., 19 F.2d 832, 834; Harris v. Pennsylvania Railroad Co., 4 Cir., 50 F.2d 866, 867; The Carson (Brashear v. Union Dredging Co.), 9 Cir., 104 F.2d 762, 764; The G. W. Glenn (Brown v. Donoho), D.C., 4 F.Supp. 727, 730. They all float and they all can be grasped by and sustain drowning persons. Although some of the cases do not,[1] we think common sense does distinguish between such "buoyant apparatus" and the one inch heaving line of the principal case, Harris v. Pennsylvania Railroad Co., above cited; The G. W. Glenn (Brown v. Donoho), above cited. The difference in life saving utility between a very small line that sinks and a comparatively large object that floats is too apparent for exposition. By the same token, the difference in cost of stepping-up the specific gravity (a heaving line having other uses) is too trivial for comment. We prefer to balance the budget on the side of the cheap precaution rather than to so characterize the life it is designed to save. The learned judge writing the opinion in Harris v. Pennsylvania Railroad Co., above cited, points out that these considerations have peculiar force in the field of the principal case. With some eloquence, he says: "There is no other peaceful pursuit in which the dominion of the superior is so absolute and the dependence of the subordinate so complete, as in that of a sailor upon a vessel at sea. * * * If he is taken sick or is injured on board the ship, or *is cast into the sea* by the violence of the elements or *by misfortune or negligent conduct,* he is completely dependent for care and safety upon *such succor* as may be given by the members of the crew. By reason of these conditions, the maritime law extends to mariners a protection greater than is afforded by the general rules of common law to those employed in service upon the land. From time immemorial, seamen have been called the 'wards of admiralty'; and in this country as elsewhere the Legislature has enacted an elaborate system of legislation for their protection." Harris v. Pennsylvania Railroad Co., 4 Cir., 50 F.2d 866, 868. (italics ours)

We are not interested in the life preservers on the launch. There was a complete failure to do anything with them. The question of lights or flares is a fortiori to the one at bar.

We must regret libelant's method and manner of trial. The learned trial judge had just occasion to complain of the submission to him of a misquoted citation, 7 C.J.S., Attorney and Client, § 23(e), page 753. No offer of expert testimony was made, Ekblom v. G. O. Reed, Inc., 5 Cir., 71 F.2d 399, nor was there any reference to its pragmatic companion "similar facts and transactions showing methods of preventing injury", Sporsem v. First National Bank, 133 Wash. 199, 233 P. 641, 40 A.L.R. 854. Any trial judge can testify to the general availability of the former, and some slight examination of our own indicates a plethora of the latter. For instance, we find the English Board of Trade provides:

"Class XII * * * steam fish carriers, steam lighters, dredgers, steam hoppers, and *hulks which do not proceed to sea.* * * *

"Rule B—A ship of this class shall carry two approved lifebuoys." Rules promulgated under Merchant Shipping Act, 1894 (57 & 58 Vict., c. 60 § 427(2).

And in this country a somewhat analogous[2] provision of the Department of Commerce reads: "Any open or uncovered barge carrying passengers while in tow of any steamer shall carry 1 life preserver or 1 float for every person carried. * * *" Rule 9, § 1, Barges—Department of Commerce, Steamboat Inspection Service, General Rules and Regulations Prescribed by

---

[1] Young v. New Orleans Coal & Bisso Towboat Co., D.C., 8 F.2d 310; Martin v. Lower Coast Construction Co., 5 Cir., 16 F.2d 835.

[2] We say somewhat analogous because this rule, enacted under 46 U.S.C. § 490, 46 U.S.C.A. § 490, involves the meaning to be attributed to the word "passengers".

the Board of Supervising Inspectors—Rivers, March 2, 1931, p. 123.[3]

In discussing the general subject our Sea Scout Manual uses language quite applicable to the facts at bar:

"Another type of life preserver often seen is the ring buoy. These are to be found attached to the rails and bridge combings of large vessels; on hooks against a deck house or secured to the *standing rigging on smaller boats*; sometimes merely resting on the after-deck, in all cases ready for instant use. They are for use, when the cry 'Man Overboard' goes ringing through the ship. It is the duty of the man nearest a life buoy to instantly toss it overboard, first securing the lemon, or bitter, end of the line at-tached to the ring, usually by placing his foot over the line. * * *

"The man who has fallen overboard thanks to *modern safety laws* stands a very good chance of again reaching his vessel. Even though *not a swimmer* the dire emergency of the situation will often enable a man to *somehow fight to the life ring and cling on.*" Sea Scout Manual, pp. 38–39. (italics ours)

The decree of the District Court is vacated and the cause remanded for the entry of an interlocutory decree fixing the respondent's liability, to be followed by the determination of the damages to which the libelant is entitled, and the entry of a final decree pursuant to such determination.

---

[3] Similar provisions for various craft in varying circumstances are found collected in other literature, Department of Commerce, Bureau of Marine Inspection and Navigation, Laws Governing Marine Inspection, April 1, 1938, pp. 93, 107, 108, 109, 146, 147; International Conference on Safety of Life at Sea, Convention and Final Act, 1929, pp. 59, 62, 63, 68; International Convention on Safety of Life at Sea, Issued by the United States Shipping Board, 1929, pp. 41, 42, 43; Department of Commerce, Steamboat Inspection Service, General Rules and Regulations Prescribed by the Board of Supervising Inspectors—Ocean and Coastwise, March 2, 1931, 83–89; Department of Commerce, Steamboat Inspection Service, General Rules and Regulations Prescribed by the Board of Supervising Inspectors—Great Lakes, March 2, 1931, pp. 80–86, 133; Department of Commerce, Steamboat Inspection Service, General Rules and Regulations Prescribed by the Board of Supervising Inspectors—Bays, Sounds, and Lakes Other than the Great Lakes, March 2, 1931, pp. 78–87, 129; Department of Commerce, Bureau of Marine Inspection and Navigation, General Rules and Regulations Prescribed by the Board of Supervising Inspectors—Tank Vessels, Rules and Regulations Series, No. 14, April 19, 1939, pp. 27, 104, 117–123; Department of Commerce, Bureau of Marine Inspection and Navigation, Supp. 2, General Rules and Regulations Prescribed by the Board of Supervising Inspectors, Rules and Regulations Series, No. 15, May 5, 1939, pp. 11–13, 14–20; Department of Commerce, Bureau of Marine Inspection and Navigation, Instruments, Machines, and Equipments Approved, Vessels Inclined, and Rulings, September 25, 1936, pp. 2–4; Department of Commerce, Bureau of Marine Inspection and Navigation, Manual for Lifeboatmen and Able Seamen, March 1937, pp. 23, 24. It will be noted that some of this has to do with ships on the open sea rather than on inland waters. It may be, however, that a tendency to omit the precaution of rails, etc., on the craft appropriate to the latter, minimizes the difference in hazard.