This suit is brought under an Act of Congress, Section 33 of the Merchant Marine Act of 1920, 46 U.S.C.A. § 688, popularly known as the "Jones Act". Mrs. Lola Macomber, as administratrix of the succession of her late husband, John B. Macomber, proceeding in the Civil District Court for the Parish of Orleans, against the De Bardeleben Coal Company, Inc., the owner and operator of the steam tug "Clara", claimed $28,435.20 as damages, said to be due because of the death of her husband, by drowning, which is alleged to have been occasioned by the negligence of the master and crew of the "Clara". Plaintiff's husband was drowned in a navigable stream, the "Intercoastal Canal near Bay Wallace", when he fell from a ladder on which he stood while "swoogying" (cleaning) the smokestack of the tug boat. Defendant removed the case to the Federal Court for the Eastern District of Louisiana, which court, upon motion of the plaintiff, remanded it to the Civil District Court. The charges of negligence, as set forth in the petition, are as follows:
"(a) In failing to furnish a safe ladder with the necessary safety cleats to keep it from slipping.
"(b) In not having a competent deck hand to work with your petitioner's decedent, and one who would attend his duties and not allow a ladder on which a man was working to slip and fall.
"(c) In employing as a co-worker to decedent an incompetent man who failed to *West Page 485 
render any assistance to decedent to prevent his drowning, although life preservers were available and could have prevented the tragedy.
"(d) In that both the officers and crew failed to throw a life preserver, which was available to decedent or do anything to assist him although having the means and equipment necessary to do it."
Denying that its employees had been guilty of negligence, the defendant, in the alternative, pleaded contributory negligence on the part of Macomber.
A jury returned a verdict in plaintiff's favor in the sum of $7,269.40. From the judgment based upon this verdict defendant has appealed.
The primary question for our consideration is whether the defendant's employees were guilty of negligence. Contributory negligence on the part of the deceased would not prevent, but only modify, recovery, because the Jones Act recognizes the doctrine of comparative negligence (Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Ducombs v. Lykes Bros. S.S. Co., Inc., La.App., 1 So.2d 114 and Volume 1 of the Law of American Admiralty by Benedict, 6th Edition by Knauth, Page 51) which, we might add, once obtained in this State. Article 2323, Revised Civil Code of 1870; 11th Tulane Law Review, 112; Fortunich v. City of New Orleans, 14 La.Ann. 115.
There appears to be no dispute as to the facts. Macomber and Leonard F. Edgecombe were seamen on the steam tug "Clara" and were engaged in conversation while seated on her deck, when Macomber remarked that the smokestack was dirty or, as Edgecombe says Macomber put it "damn it is dirty", whereupon they procured a ladder, placed it against the smokestack and Macomber ascended it and began "swoogying" the surface of the stack. As he started to descend the ladder with one hand on the guy wire supporting the stack and the other on the upright of the ladder, his foot missed a rung, he released both hands and fell over backwards to the deck, slipping through the boat's rail into the water. Edgecombe, who had been holding the ladder, seeing him fall, dropped it and unsuccessfully attempted to grab him before he went over the side of the tug. He was the only eyewitness.
There is no evidence to the effect that the ladder was unsafe or that it was allowed to slip when Macomber was on it.
However, it has been proven that no life preserver was thrown to Macomber and if the defendant's employees can be said to be negligent, it must be upon this account.
At the time of the accident the "Clara" was moving at the rate of about seven miles per hour against a head wind, calculated by several witnesses, to be blowing at the rate of two miles per hour. The weather was clear and the water calm. The boat was proceeding on an even keel. When he saw Macomber go over the side of the vessel, Edgecombe, fearing that he would be struck by the wheel, called to A.A. Smith, who was in charge of the wheelhouse, "man overboard". Smith and Edward J. Angelo, the Captain, who had heard the cry, ordered the engines reversed or "full speed astern". The first time that Macomber was seen after he fell from the vessel he was struggling in the water about three hundred feet to the rear. It is contended that Edgecombe should immediately have thrown a life preserver over to Macomber. According to the testimony of the Chief Engineer, it could have been thrown into the water in about a minute. Instead of throwing the life buoy Edgecombe and other members of the crew lowered the life boat and attempted to rescue Macomber. A singular and unfortunate aspect of the case is that Macomber could have saved himself by swimming about thirty feet to shallow water on the side of the canal, but the testimony is that he was apparently trying to swim to the boat which was moving down the center of the canal.
Smith testified that if the life preserver had been thrown immediately, Macomber would have been obliged to swim at least one hundred feet before he could get it, because of the rate at which the vessel was traveling and the wind blowing. It is estimated that the boat with its headway, when added to the tide caused by the wind, would have been eleven feet away from Macomber in one second.
It is elementary that no negligence can be imputed to the defendant for the failure of the crew to throw the life buoy unless such failure was a causative factor in the drowning of the deceased. No authorities are necessary to support this well established principle of the law of negligence.
Plaintiff's counsel cite a number of authorities to the effect that it is the duty of the ship and the owner under the law of the sea to rescue a seaman who falls overboard, *West Page 486 
and that the ship is liable to respond in damages if the seaman is abandoned to his fate. Brown v. Donolo, D.C., 4 F. Supp. 727; Harris v. Pennsylvania R.R., 4 Cir., 50 F.2d 866; United States v. Knowles, Fed.Cas.No.15,540, 4 Sawy. 517; Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082.
Harris v. Pennsylvania R.R. Company, supra, is a case in which the Circuit Court of Appeal for the Fourth Circuit reversed the finding of a district judge directing a verdict, where the evidence showed that the crew of a vessel failed to throw a life preserver to a fireman who had fallen overboard. When the fireman fell into the water he was fifty feet from the stern of the ship, which was moving forward at about the pace of an ordinary pedestrian. Instead of throwing a life buoy overboard, a member of the crew threw a six inch hawser. The court, in its opinion, said [50 F.2d 869]: "* * * it was for the jury to decide whether the man could have been saved if due diligence had been used. The deceased, even when last seen, was within 200 feet of the point at which a life ring, if promptly thrown, would have rested on the surface of the water. He was evidently making every possible effort to save himself. Whether in any event he would have succeeded is not a certainty, but in our view there was enough testimony tending to show a reasonable probability of rescue, had a life ring or heaving line been used, to justify the submission of the question to the jury."
But the facts in this case are different. Here the boat was going much faster than a pedestrian walks and it would seem that there would have been a better chance to reach the drowning man with a life boat than with a life preserver which, according to the evidence, could only be thrown about thirty-five feet. Edgecombe, the only one of the crew who was in a position to throw the life buoy within a reasonable time after Macomber went over the side, did not do so because his first thought was the imminent peril confronting Macomber because of the revolution of the propeller with which he might have become entangled. Then too, the ladder, when released by Edgecombe, fell in his path and delayed him some. He also attempted to grab Macomber as he slipped through the railing which further delayed him. We are convinced that by this time Edgecombe could have accomplished nothing by casting the buoy overboard. We cannot say that what he did do in the emergency was not better calculated to effect a rescue than what he left undone. Edgecombe and Macomber were very good friends. They had been on other ships together, consequently, there was every reason why he should apply himself to the rescue with extraordinary vigor. He had only a few seconds to decide upon his course and if, in the emergency, he erred, we do not believe it can be said that he was negligent.
Our attention has been directed to the case of Kirincich v. Standard Dredging Company, 3 Cir., 112 F.2d 163, 164. In that case recovery was allowed because the crew of the vessel were negligent in failing to throw a life preserver to a seaman in the water, but the facts are quite different. There the seaman was struggling in the water about twenty yards from the bow of a derrick barge from which he fell, crying for help. The crew threw "heaving lines" in his direction, repeating the operation three times, and, at one time, coming within two feet of the drowning man. There the Court said:
"In the light, then, of this logic and these examples, would Kirincich have drowned even if a larger and more buoyant object than the inch heaving line had been thrown within two feet of him? If he could swim, even badly, there would be no doubt. Assuming he could not, we think he might (the appropriate grammatical mood) have saved himself through the help of something which he could more easily grasp. We can take judicial notice of the instinct of self-preservation that at first compensates for lack of skill. A drowning man comes to the surface and cluthes at what he finds there — hence the significance of size and buoyancy in life saving apparatus."
The situation prevailing in this case is quite different. When it is all said and done it is difficult to understand how Macomber fell into the water and why, after falling, he was not able to rescue himself. We cannot understand and there is no explanation in the record why he should have released his hold of the guy wire and the ladder when his foot, slipped through the rung, nor does there appear any explanation of his failure to save himself after falling, since he was within thirty-five feet of shallow water. The captain testified that the channel, in which they were running, was one hundred feet wide and was marked by beacons, which indicated the shallow water. Macomber fell overboard near Beacon No. *West Page 487 
32, marking the edge of the deep water. The tug, from whose deck he fell, was twenty-one feet wide so it is apparent that he would have had but a short distance to swim to save himself. The captain expressed the opinion that Macomber did not know how to swim as a possible explanation. If this be true there was no chance of his swimming to a life buoy, which could not have been thrown in time to be anything like as near to him as the shallow banks of the canal.
Our conclusion is that the charge of negligence has not been sustained by the evidence, consequently plaintiff's case must fail.
Counsel, however, contends that we cannot go into the sufficiency of the evidence or reverse the judgment on the facts as found by the jury and in no event can we do more than reverse the judgment based upon the jury's verdict and remand the case for a new trial, this, because the Federal Appellate Courts are said to be so restricted.
Under the Jones Act the personal representative of a seaman killed in the course of his employment may, at his election, "maintain an action for damages at law against his employer, with the right of trial by jury, and in such action, all statutes of the United States conferring or regulating the right of action for death in the case of railway employees are applicable". Benedict on Admiralty, 6th Edition, Volume 1, Page 44. Such actions "may be brought in the Federal or State Courts or, in personam, in Admiralty, but not in rem. Wherever brought they may not be removed. When brought in the Federal Courts jurisdiction is vested in the Court of the District in which the defendant employer resides or in which his principal office is located." Ibid 44, 45.
Originally some confusion arose concerning the jurisdiction of the state courts due to the wording of the provision in the act to the effect that "jurisdiction in such actions shall be under the Court of the District in which the defendant employer resides or in which his principal office is located". It was contended that the act in referring to the courts of the district "manifested a purpose to restrict enforcement of the newly given rights to the Federal District Courts". The Supreme Court of the United States, however, while admitting some ambiguity, said:
"We think it falls short of that certainty which naturally would be manifested in making an intended departure from the long-prevailing policy evidenced by the saving clause in the Judiciary Act of 1789 and in the two sections of the Judicial Code, and that the more reasonable view is that it is intended to regulate venue and not to deal with jurisdiction as between federal and state courts. Panama R. Co. v. Johnson, supra [264 U.S. 375], pages 384, 391 [44 S.Ct. 391, 68 L.Ed. 748]; [In] re East River Co., 266 U.S. 355, 368, 45 S.Ct. 114, 69 L.Ed. 324; Engel v. Davenport, 271 U.S. 33, 46 S.Ct. 410, 70 L.Ed. 813 (decided April 12, 1926)". Panama Railroad Company v. Vasquez,271 U.S. 557, 46 S.Ct. 596, 597, 70 L.Ed. 1085.
In Engel v. Davenport [271 U.S. 33, 46 S.Ct. 412, 70 L.Ed. 813], it was definitely held, that:
"It is clear that the State courts have jurisdiction concurrently with the Federal courts, to enforce the right of action established by the Merchant Marine Act as a part of the maritime law."
The plaintiff elected to bring her suit in the state court. It is elementary that in matters of procedure the law of the forum governs.
"In matters of procedure, or as sometimes stated, in matters of remedial rights, it is clearly settled that every case must be governed by the law of the place where the remedy is sought, even as to rules of evidence and rules of practice." American Jurisprudence, Volume 11, Sec. 186, Page 498.
In Louisiana under Article 7, Section 19 of the Constitution of 1921, it is provided that in all appeals to the several Courts of Appeal of this State the appeals shall be both upon law and facts. Article 905 of the Code of Practice provides that "when the Supreme Court [the article also applies to the Courts of Appeal] reverses the judgment of an inferior court, it shall pronounce on the case the judgment which the lower court should have rendered, if it be in possession of all the facts and testimony to enable it to pronounce definitively".
Where the verdict of a jury, based upon facts alone, is clearly erroneous, it will be reversed. Lewis v. Louisiana Northwest R. Co., 2 La.App. 176; Chisolm v. Roppolo, 2 La.App. 269; Bass v. Illinois Central R. Co., 4 La.App. 175; Hardee v. Nevers, 10 La.App. 537, 120 So. 227 *West Page 488 
and Hebert v. New Orleans Public Service, 10 La.App. 341, 119 So. 575.
In the Hebert case we said: "We are very reluctant to disturb the jury's finding and substitute therefor our own conclusions upon the facts as they appear in cold type in the record, without the opportunity of seeing and hearing the testimony from the living lips of the witnesses. We fully appreciate the advantage possessed by the jury in reaching their conclusion and are conscious of our own limitations in that regard. Nevertheless, under our peculiar (and to the mind of the writer, unfortunate) system of jury trials in civil cases, it is our duty to set aside a judgment based upon the verdict of a jury whenever it appears to us erroneous, and to substitute therefor such judgment as in our opinion should have been rendered, whether the case turn upon a question of fact or of law."
We find nothing in the Jones Act which conflicts with the Louisiana Law of Procedure and nothing which compels anything different from what is there provided, consequently, all cases based upon the Jones Act which are filed in the State Courts of Louisiana should, so far as procedure is concerned be considered as though the cause of action arose under a statute of Louisiana.
In our opinion this case, if it had been tried in the Federal Court, would not have gone to the jury, but would have been disposed of by a directed verdict pursuant to the procedure prevailing in that Court.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of defendant dismissing plaintiff's suit at her cost.
Reversed.