Helen B. ELLIOTT, Individually and as Administratrix of the Estate of Darlene Julie Elliott, Appellant,

v.

MICHAEL JAMES, INC., t/a Gentlemen II, et al.

No. 72–1710.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1973.

Decided Nov. 26, 1974.

Rehearing Denied Jan. 7, 1975.

Roger E. Warin, Washington, D. C., with whom Laidler B. Mackall and John Day, Washington, D. C., were on the brief for appellant.

James C. Gregg, Washington, D. C., was on the brief for appellee.

Before WRIGHT and LEVENTHAL, Circuit Judges, and MATTHEWS,* Senior United States District Judge for the District of Columbia.

MATTHEWS, Senior District Judge:

This is an appeal from a judgment for the defendants in a wrongful death action tried by the District Court without a jury. The plaintiff-appellant (plaintiff), Helen B. Elliott, is the administratrix of the estate of her twenty-year old daughter, Darlene Elliott, whose death was allegedly caused by the negligence of the defendant-appellees (defendants), Michael James, Inc., Michael G. O'Harro and James Michael Desmond.

* Sitting by designation pursuant to 28 U.S.C. § 294(c).

On June 23–24, 1968, the defendant corporation operated a restaurant-bar, known as Gentlemen II, located at 1800 M Street, N. W., in Washington, D. C. The two individual defendants,. Michael G. O'Harro and James Michael Desmond, were then president and vice-president, respectively, of the defendant corporation, and responsible for the day-to-day operations of the restaurant-bar.

Darlene Elliott, plaintiff's decedent, had been hired to work as a bookkeeper in a restaurant to be opened later in Baltimore. In the meantime, until the restaurant opened, she was working as a trainee bookkeeper on Monday through Friday of each week at defendants' restaurant, Gentlemen II. Her hours were from about 9:00 a. m. to 5:00 p. m. She had commenced this work in June 1968—about three weeks prior to her death.

### I

During her last June week end, Darlene Elliott visited her mother in Baltimore, and went to the beach at Ocean City with a young Maryland man she had long known. They reached Washington late Sunday afternoon, June 23, 1968. Expecting to stay with her sister but not finding the sister at home, Darlene Elliott picked up her car in Georgetown and then stopped by the restaurant-bar with her friend for refreshments.

While they were being served as guests, Paul Fleischer, night manager, expressly invited Darlene Elliott to remain after the midnight closing and to drive him home. Accordingly, she remained when her Maryland friend departed about 9:30 p. m. The individual defendants knew that the night manager, who had no car, sometimes asked a guest to remain after hours and drive him home. Thus they were aware that an individual not working at the restaurant-bar might be there after closing hours. The closing duties of the night manager included counting the day's receipts, making the appropriate entries and the like, all of which would take about an hour.

It is undisputed that between midnight and 4:00 a. m. on Monday June 24, 1968, at the restaurant-bar, Stanley Cobb, who was employed by the corporate defendants as a combination night busboy and clean-up man at the restaurant-bar, knifed to death Darlene Elliott during a violent struggle. The body of Miss Elliott was found on the first or main floor. Stanley Cobb was found alive in the kitchen area of the first floor, suffering from superficial wounds. Later, during a general search of the premises by the police, the dead body of the night manager was discovered in the basement.

A United States Park Police officer, driving east on M Street, passed the restaurant-bar at approximately 3:00 a. m. on June 24, 1968. He heard a scream which sounded to him to be that of a woman. He stopped and listened but heard nothing further.

On the same day about an hour later the police arrived at the restaurant-bar in response to a call made to the telephone company (allegedly by Stanley Cobb) of intruders in the restaurant-bar. When the police found no evidence of forcible entry and all doors to the restaurant-bar securely locked, they broke into the place to gain admittance.

Once on the first floor of the premises the police discovered "a massive crime scene" and "extensive evidence" of an over-all struggle between Darlene Elliott and Stanley Cobb. The struggle was long drawn out and indicated that Darlene Elliott fought with Cobb in an effort to save her life.

All exits from the restaurant-bar were found by the police securely locked from the inside in such a fashion that they could not be opened from the inside except by a key which was not in any lock.

The restaurant-bar, Gentlemen II, was a Group F-2 Assembly use building as defined by Section 3–209(b) of the

1961 Building Code of the District of Columbia. As a Group F-2 Assembly use building the restaurant-bar was subject to the following requirements of the Building Code:

Section 3–643(j) *"All doors* used in connection with means of egress *shall be so arranged as to be always readily opened* from the side from which egress is made. *Locks, where allowed, shall not require a key to unlock from the inside."* (Emphasis supplied.)

Section 3–6143(e) "All exit doors shall remain entirely unobstructed and/or unobscured at all times."

In the introduction to the 1961 Building Code at page vii, it is stated:

*"Purpose and Scope.* This code provides minimum standards to safeguard life and limb, health and property, by regulating the design, construction, quality of materials, and maintenance of all buildings and structures within the jurisdiction of the Board of Commissions of the District of Columbia.

"The provisions of this code constitute minimum standards. Compliance with these standards will result in construction which is reasonably free from hazard but not necessarily the most efficient or convenient. This code is to be regarded neither as a design specification nor an instruction manual. Good service and satisfactory results may necessitate designs of higher standards than the required minimum."

The restaurant-bar in question had only three exits, all located on the main floor level, one on M Street and two on 18th Street.

The exit on M Street consisted of two double doors secured by a deadbolt lock in the middle of the doors and two sliding bolt locks on one of the doors at the top and bottom of the door. A deadbolt is not a spring-operated bolt but a solid rectangle of metal that can only be operated with a key. These main front doors were secured by sliding the hand-operated bolt locks into the ceiling and floor and locking the deadbolt lock in the middle of the doors with a key. When the hand-operated bolt locks and/or the small inside latches on the main front doors were in place, these doors could be opened from the inside or outside only with the use of the key to the deadbolt lock.

One of the two 18th Street exits was not regularly used and was secured by padlocks and bolts and also had equipment piled against it. The other 18th Street exit was secured with a hasp, padlock and crossbar. It was used for delivery of drygoods and liquor and by the help, but was always secured at night.

The defendants had established and regularly engaged in the practice of locking all exits after the restaurant-bar was closed for business so that the doors could not be opened without a key. Responsibility for locking up the restaurant-bar rested upon the night manager. After the customers left the restaurant-bar at the close of business, the night manager, pursuant to such established practice, locked the doors, thus locking the customers out and locking the staff in.

It was customary for the night manager to lock the doors from the inside with his keys while he counted the day's receipts and then when he left to lock Cobb inside the restaurant-bar for the remainder of the night without a key. The practice of locking the night staff inside the restaurant-bar after closing was due to the fact that the defendants did not trust Stanley Cobb with the keys to the exits of the restaurant-bar. Keys to the doors were issued only to the defendants O'Harro and Desmond and the day and night managers.

While the premises of the restaurant-bar consisted of a basement, a main floor, a mezzanine, and a third floor, the windows in the building did not provide an escape route. The basement windows opened on barred-in window wells below the surface of the street; the windows on the first floor were plate glass and could not be opened. No outside windows opened onto the mezzanine. Al-

though the third floor had windows, they were three floors above the ground.

The main floor of the restaurant-bar consisted of a lobby or vestibule, the principal dining room, an alcove dining room, a ladies' restroom, and the kitchen facilities. Upon entering the main door on M Street there was an open stairway on the left leading to the open mezzanine facing down on the principal dining room. Access to the basement[1] was through a stairwell leading through the kitchen which was always open. Use of the same stairwell was necessary to get out of the basement as no exit from the basement existed.

Police officers who arrived at the massive crime scene found considerable physical evidence throughout the entire main floor of an over-all struggle which had taken place between Darlene Elliott and Cobb. Strewn around the first floor of the restaurant were the contents of a woman's purse, an earring, and a woman's underclothing including a pair of blue panties and a bra. Blood had been spilled in various places on the main floor, including the dining room and the kitchen, and bloody hand prints were on some of the walls. In the vestibule or lobby to the right of the main door was a cloakroom containing coat racks, and there was blood on a hook at the bottom of one of the coat racks. The body of Darlene Elliott was on the main floor, her head near the foot of the mezzanine stairway, and her feet toward the principal exit. There was blood on the "panic bar" at an 18th Street exit on the main floor, blood on the floor there, together with a button and a tablecloth. This "panic bar," when depressed, would release the top and bottom locks so that the door could be opened but for the other devices preventing such opening. The body of the night manager was not found on the main floor but in the basement.

Stanley Cobb was convicted of two counts of second degree murder on January 29, 1970, and his conviction was affirmed. United States v. Cobb, 146 U.S.App.D.C. 69, 449 F.2d 1145 (1971). He did not testify at his trial, nor in the instant case.

## II

In the present case, plaintiff maintains that the defendants' affirmative acts created an unreasonable risk at the restaurant-bar, and hence that the resulting negligence was active rather than passive. The evidence clearly shows that *after* Darlene Elliott entered the restaurant on Sunday, June 23, 1968, while it was open for business, the defendants deliberately used operative locks "that required a key to unlock from the inside" on all three ground floor exits. The defendants established and approved of the practice of securing these doors each evening. The plaintiff's complaint does not limit itself to the claim that egress was prevented solely because of pre-existing conditions negligently created by the defendants, such as the installation of key locks on the exit doors. The evidence clearly shows that these pre-existing conditions were activated *after* Darlene Elliott entered the premises. This was done by the defendants' employee, Paul Fleischer, when he took affirmative steps to secure the doors as he was required to do each and every evening.

While it is true that doors must be secured to keep intruders out, the defendants could have easily and conveniently realized this purpose without *creating undue risk to those on the premises.* The defendants could have used the panic bar devices and other widely used locks that prevent unauthorized entry from the outside while permitting easy and safe egress from the inside.

The 1961 Building Code was designed to provide "minimum standards to safeguard life and limb" by regulating "the *design,* construction, quality of materials, and maintenance of all buildings." (Emphasis added.) These minimum standards require that all egress doors of restaurant-bars "be so arranged as

---

1. The basement contained the liquor room, a drygoods storeroom, female employees' locker room and restroom, male employees' locker room and restroom, and the boiler room.

to be always readily opened from the side from which egress is made" and prohibited the installation and use of locks that "require a key to unlock from the inside." These standards were formulated with due regard to the burdens that such requirements would place upon commerce. This in turn was a function of the then existing state-of-the-art regarding building construction and design and the availability of required appliances on the market, such as locking devices that would keep unauthorized persons out and at the same time permit quick and convenient egress.

We view the 1961 Building Code requirements as *design* standards. Their application is not dependent upon whether the building is open to the public. This distinct difference between building code regulations and other specialized safety regulations is substantiated by the fact that the similar requirements imposed by the Police and Fire Regulations of the District of Columbia are effective only when "the building is occupied" (Art. 17, Sec. 1 of the Police Regulations of the District of Columbia) or "whenever any place of assembly is occupied as such." (Title 7 of the D.C. Rules and Regulations (Fire Department), Chapter II, Section 21.4.) These police and fire regulations contain these limitations because they were designed to minimize specific risks that would occur under certain circumstances, such as panic and fire when assembly buildings were filled with people. The 1961 Building Code, on the other hand, does not contain this qualifying language because it was recognized that there were a great number of internal hazards which would necessitate easy egress for any person within a particular building at any time and that this risk could be minimized without undue burden upon the owners of buildings through the *design* of exits and the use of locks readily available on the market.

We note that at the time of her death Darlene Elliott had been employed for only three weeks at the restaurant-bar. Her normal working hours were from 9:00 a. m. to 5:00 p. m. As the place was already open for business at those hours, the use of a key by any one of the four individuals possessing a key, seems not to have been involved during Darlene Elliott's working hours. On the other hand, the night manager and Stanley Cobb had been employed at the restaurant-bar longer than Darlene Elliott, their hours of employment differed from hers, and involved a period during which the restaurant-bar was closed for business by securing the door with a key. There is nothing in the record to reflect that prior to the night Darlene Elliott was killed she was aware of the practice of the defendants (through their night manager) of locking the exit doors and then removing the key, thus leaving no visible means of escape from the establishment in the event of an emergency.

### III

In his memorandum opinion the District Judge described the claim of negligence in this case as "that at the time of the killing all exits from the restaurant were locked from the inside, that plaintiff's decedent did not have a key, and that accordingly plaintiff's decedent was prevented from fleeing the assailant."[2] Further, the District Court commented that on the night in question, Darlene Elliott "did not have a key, the door had no key in the inside lock, and without a key she had no clearly visible means of escape from the restaurant."[3]

As for the safety regulation, the District Court concluded that the defendants did in fact violate Section 3–643(j) of the Building Code of the District of Columbia "in that on the particular evening the doors were not readily opened from the inside but required a key to unlock them and no key was in the locks."[4]

---

2. Memorandum Opinion, filed June 2, 1972, Brief of Appellant and Appendix, p. A 43.

3. *Id.* at A 45.

4. *Id.* at A 46.

Under the circumstances the court viewed the crucial factual issue presented as "whether defendants' violation of this [safety] regulation was the proximate cause of the wrongful death of plaintiff's decedent."[5] Stated differently, the issue was whether "the locked doors were the proximate cause of the death."[6] Ruling in favor of the defendant violators of the safety regulation the court said in part:

"Cobb [the employee who killed Darlene Elliott] did not testify at the trial and accordingly all facts are entirely circumstantial. * * * Most importantly, there is no *direct* evidence that the locked exits contributed to the death of either victim." (Emphasis added.)[7]

For this jurisdiction the evidence rule was stated by Mr. Justice Rutledge, then of this court, and later of the Supreme Court, in Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825 (1941) as follows:

"Generally speaking, direct and positive testimony to specific acts of negligence is not required to establish it. Circumstantial evidence is sufficient, either alone or in combination with direct evidence. Circumstantial evidence may contradict and overcome direct and positive testimony. The limitation on its use is that the inferences drawn must be reasonable. But there is no requirement that the circumstances, to justify the inferences sought, · negative every other positive or possible conclusion. The law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory." 75 U.S.App.D.C. 147–148, 124 F.2d 839–840.

Prosser, renowned writer on the law of torts, commenting on the factual issue of causation says:

"[The plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. * * *

\* \* \* \* \* \*

"He need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant has acted otherwise. * * * If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion, may be permissible that the causal relation exists." (Citations omitted.)[8]

It is asserted by plaintiff that the circumstantial evidence adduced at trial and facts found to exist by the court were such as to have reasonably permitted an inference favorable to plaintiff regarding causation but for the court's mistaken belief that *direct* evidence was required.

According to plaintiff, the testimony at the trial proved the following facts:

1. The doors to the restaurant-bar, Gentlemen II, were locked in the normal manner after the close of business on the evening of June 23, 1968, or the early morning of June 24, 1968.

2. There was a brutal struggle between Stanley Cobb and Darlene Elliott that lasted over a considerable period of time and throughout the entire main floor of the restaurant-bar.

3. A long struggle had also taken place between Stanley Cobb and Paul Fleischer in the basement and on the basement stairs.

5. *Id.*

6. *Id.* at A 47.

7. *Id.* at A 45.

8. Prosser, The Law of Torts § 44, pp. 222–223 (2d ed. 1955).

4. As to the main floor, there were blood stains on a panic bar on one of the 18th Street exits, blood stains on a coat rack near the locked front door exit and an earring near one of these exits.

These facts viewed in the context of common sense and experience argue strongly for the following conclusions:

1. That Darlene Elliott made an attempt or repeated attempts to escape from the building while she was struggling with Cobb or when Cobb was attacking Paul Fleischer in the basement. Such attempts would be the normal response of anyone situated in a similar situation.

2. That Darlene Elliott had an opportunity to make such escape attempts. This is confirmed by the facts that (a) she was able and in fact did move throughout the entire main floor in order to avoid the repeated attacks of Stanley Cobb; and (b) Stanley Cobb was also involved in a brutal struggle with Fleischer which occurred prior to or during Cobb's repeated assaults upon Darlene Elliott. It is extremely unlikely that the attack upon Fleischer occurred after Darlene Elliott was dead, since such a conclusion would necessitate an inference that Fleischer acquiesced in the long drawn out attack upon Darlene Elliott.

3. That the locked doors prevented Darlene Elliott from making good her escape attempts. This is confirmed by her movements throughout the main floor which brought her in close proximity to all three main floor exits, by blood stains on the panic bar and front door coat rack and the presence of decedent's earing near one of these exits.

Because it is normal for one to attempt to escape from such terrifying circumstances and because Darlene Elliott had an opportunity to do so, the most reasonable conclusion is that she did in fact try to escape. This coupled with evidence that someone attempted to escape from various exits seems to compel the conclusion that in all reasonable probability that person was Darlene Elliott.

## IV

The Building Code itself makes evident its purpose to provide "minimum standards to safeguard life and limb."

Clearly, we think, the requirement that doors be readily opened from the inside without a key was designed to protect persons within the restaurant-bar against entrapment by affording them a reasonably quick exit, evacuation, or escape, in the event of the arising of an internal danger or peril of whatever kind. Ordinarily, when the requirement that doors be readily opened from the inside without a key is fulfilled, it expedites the exercise by persons within the building of their normal power of self-protection, namely, flight from the danger or peril threatened. On the other hand, when, as in this case, there is a failure to meet the requirement such failure negates the protection intended by the safety measure, and increases the risk of harm. We think that plaintiff's decedent was a member of the class of persons for whose protection the safety measure was adopted.

The negligence in this case embraces not only the violation of the safety requirement but also the affirmative acts of defendants (through their manager) of securing all exits in such a manner that occupants of their restaurant-bar could not leave the premises without a key which was not in any lock.

"If there was negligence it very properly could be found to have been the proximate cause of the death." Munsey v. Webb, 231 U.S. 150, 156, 34 S.Ct. 44, 45, 58 L.Ed. 162 (1913). While causal connection between the negligence complained of and the loss incurred must, of course, be proved, physical causation need not be proved by eyewitnesses, but causation may be found as an inference from evidentiary facts. Emery v. Tilo Roofing Co., 89 N.H. 165, 195 A. 409 (1937).

Lastly, we note that there is an "instinct of self-preservation" which the District Court was free to judicially notice as to the plaintiff's decedent,

**1186**

Darlene Elliott. Kirincich v. Standard Dredging Co., 112 F.2d 163, 164 (3rd Cir. 1940). The recognition here of this instinct of self-preservation would be entirely consistent with the long drawn out struggle which Darlene Elliott waged for her life throughout the entire main floor of the restaurant-bar.

■ We are not satisfied that the trial judge gave effect to inferences reasonably to be drawn from the plaintiff's case.

Accordingly, the judgment of the District Court is reversed, and the case remanded for a new trial.

So ordered.