I cannot agree with the opinion of my associates on the question of negligence charged against the defendant, and, in order to clearly set forth my view, I deem it advisable to restate the entire case.
This suit is brought by Lola Macomber, as administratrix of the estate of her late husband, John B. Macomber, against the DeBardeleben Coal Company, Inc., the owner and operator of the steam tug "Clara", to recover damages for his death on February 9, 1939, while in the defendant's employ as a deck hand, then engaged in towing barges between Houston and New Orleans. It is filed under the provisions of the Merchant Marine Act of 1920, Section 33, commonly known as the Jones Act, 46 U.S.C.A.Title 46, § 688. The gist of the action is that the death of Macomber was the direct result of negligence on the part of the officers, agents and employees of defendant, engaged as fellow members of the crew with him at the time of his death.
Macomber was 38 years of age and had been in defendant's employ prior to the fateful trip. He was engaged as a deck hand by defendant on its tug boat "Clara", and, on February 9, 1939, at about 2 o'clock p.m., was drowned while engaged in the performance of his duties. The tugboat was then "pushing" an empty barge to New Orleans, the accident occurring in the "Intracoastal Canal near Bay Wallace". She carried a crew of ten, of whom Leonard F. Edgecombe, also a deck hand, and the deceased were then on duty.
The petition sets forth the charges of negligence as follows:
"(a) In failing to furnish a safe ladder with the necessary safety cleats to keep it from slipping.
"(b) In not having a competent deck hand to work with your petitioner's decedent, and one who would attend his duties and not allow a ladder on which a man was working to slip and fall.
"(c) In employing as a co-worker to decedent an incompetent man who failed to render any assistance to decedent to prevent his drowning, although life preservers were available and could have prevented the tragedy.
"(d) In that both the officers and crew failed to throw a life preserver, which was available to decedent or to do anything to assist him although having the means and equipment necessary to do it."
The main defense is that its employees were free from fault, and, in the alternative, defendant pleaded contributory negligence on the part of the deceased.
The jury, by a unanimous vote, rendered a verdict in favor of the plaintiff for the sum of $7,269.40. The district judge rendered judgment accordingly, and from this judgment defendant has appealed.
The several charges of negligence resolve themselves into one primary question, viz.: whether the defendant's employees were guilty of negligence. It is *West Page 489 
well settled that the doctrine of assumption of risk and contributory negligence does not bar recovery in suits by seamen to recover damages under the Jones Act, for the act recognizes the doctrine of comparative negligence, and these matters can only be considered in mitigation of damages. Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Ducombs v. Lykes Bros. S.S. Company, Inc., La.App., 1 So.2d 114; Fegan v. Lykes Bros. S.S. Co., 198 La. 312, 3 So.2d 632.
I readily agree with my associates in that the charges of negligence with respect to failing to provide proper equipment and in furnishing defective appliances is clearly unsupported by the evidence presented. This is equally true as to the alleged incompetency of a co-employee in permitting the ladder, from which the deceased was working at the time of his death, to slip and fall. In reaching this conclusion, I am not unmindful of the fact that the explanation submitted by this co-employee as to why and how the deceased fell from the ladder, to say the least, is beyond the realm of commonplace occurrences, and one which I find difficulty in understanding or accepting. Serious as my doubts may be in accepting the version of how and why the deceased fell, this feature of the case is uncontroverted by other evidence and is, naturally, controlling.
There is little dispute as to the facts. The Tugboat "Clara" is about 100 feet in length by 21 feet beam. The empty barge was being pushed, there being nothing to the rear of the tugboat. Edgecombe and Macomber were on duty, conversing on the deck. At the suggestion of the latter they procured a ten-foot ladder, placed it against the smokestack, Macomber ascended and proceeded to "swoogy" (clean) the surface of the stack. On attempting to descend, with one hand holding on to a guy wire supporting the stack, and the other on the upright of the ladder, his right foot went between the rungs, he released both hands and fell over backwards. Edgecombe, the only eye-witness, says that the deceased landed on the deck in a half-reclining, sitting posture, flipped a backward somersault, his body passing underneath the 18-inch railing and dropping into the water. He testified that he made an unsuccessful effort to grab Macomber when the latter struck the deck.
The evidence clearly discloses that, upon Macomber falling overboard, Edgecombe ran or walked (alternatively used by the witnesses) to the pilot-house, a distance of 50 to 55 feet from the smoke-stack. On reaching the pilot-house, he called to Arthur A. Smith, the pilot, "Man overboard". Smith replied, "What did you say?" (his failure to hear being undoubtedly due to the noise of the engines) and again Edgecombe repeated, "Man overboard". The tug was traveling against a head tide, a moderate wind blowing obliquely against the bow, at a speed of seven to nine miles per hour. Having understood Edgecombe on the second attempt, Smith called down through the telegraph to the engine room, reversed the engine on the port side, and Captain Angelo, who was then asleep on a bunk in the pilot-house, jumped up and reversed the engine on the starboard side. Smith and Edgecombe, joined by two seamen, then made an effort to lower the lifeboat. During all of this time, the testimony of all of these parties affirmatively shows, Macomber was struggling in the water and was "swimming towards the tugboat". The futile and vain attempt to lower the lifeboat consumed ten to fifteen minutes. The engineer, Wuertz, testified that the lifeboat could not be lowered until the tug had been stopped, and that, before this was done, the tug had traveled a distance of over 500 feet. It is shown by all parties that Macomber, after struggling and swimming for some minutes or more, disappeared, and that, when he could no longer keep himself afloat, the lifeboat had not as yet been lowered. It is shown that there were six life rings on the tug. One was on each side of the deck, about five feet aft of the smoke-stack, and four on the pilot-house. These life rings were of standard size and each hung on an ordinary hook. All that was required to remove these life rings from the hooks was a mere lifting of the ring.
Everyone admits that no life ring was thrown into the water after Macomber fell overboard. The only thing done by defendant's employees in an effort to save Macomber's life is what I have detailed above at some length. Smith, the pilot, under cross-examination, testified as follows:
"Q. You are familiar with that boat, how far was this life ring from where the stack was? A. From where the man (Edgecombe) was holding the ladder, the *West Page 490 
life ring was approximately, I will say about seven feet over his head.
"Q. Could it be reached overhead? A. Yes sir.
"Q. There was no difficulty in taking down that life ring or could it have been merely lifted off the hook and thrown instantly in the water? A. Absolutely. The life ring is on a hook, it is rigged just like a life buoy, they have a hook and the life ring sets right in it, and all you have to do is take it out.
"Q. All Edgecombe had to do then was to lift out the life ring off the hook and throw it right overboard? A. Yes sir.
"Q. And he didn't do it? A. No sir.
"Q. But instead of doing that he ran forward across the deck and up on the other side of the boat, up to the wheelhouse? Do you know why he didn't throw that life ring overboard instantly? A. He just didn't think about it I guess.
"Q. He overlooked it? A. Overlooked it.
"Q. When he got up to the wheelhouse and you stopped the engines he had covered a distance of about 50 or 60 feet, was he running or walking? A. Running.
"Q. And after you threw your signal, your telegraph signal in reverse and threw your boat over hard to port, your wheel to port, you then looked out and saw this man struggling in the water? A. That's right.
"Q. After all that was done? A. Yes sir.
"Q. He was still struggling in the water? A. He was swimming in the water towards the boat.
"Q. Trying to make the boat? A. Yes sir."
These employees agree in their testimony that there was a head tide, a tide in the direction towards Macomber, and had a life ring been thrown, as it should have been, it would have floated towards him. Captain Angelo, under cross-examination, testified as follows:
"Q. I didn't ask you that. The question is, wasn't it Edgecombe's job to throw a life ring over? A. If you see a party like that overboard, the boy lost his head, he was all excited."
The pilot, Smith, admits that, had he understood Edgecombe the first time he called, he would have thrown a life ring from the pilot house. Unfortunately, when he did understand, the tug had left the deceased floundering in the water, 300 to 500 feet away.
Our Federal Supreme Court has, on several occasions, ruled that the Jones Act should be liberally construed. As was said in the case of Jamison v. Encarnacion, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082:
"The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure. * * * The act is not to be narrowed by refined reasoning or for the sake of giving `negligence' a technically restricted meaning. It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word may be read to include all the meanings given to it by courts, and within the word as ordinarily used. * * *"
In Cortes v. Baltimore Insular Lines, Inc., 287 U.S. 367, 375, 53 S.Ct. 173, 176, 77 L.Ed. 368, it was said:
"* * * This court has held that the act is to be liberally construed in aid of its beneficent purpose to give protection to the seaman and to those dependent on his earnings."
It can presently be stated that "negligence" is a word of broad significance, inclusive of several elements, and may not readily be defined with accuracy. And our courts have recognized that liability arises when one suffers injury as a result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct, and even in instances where the breach of duty is a result of inadvertence or carelessness. Jamison v. Encarnacion, supra.
Our courts, in dealing with cases as here presented, attach importance, and, I believe, correctly, to the relationship of seamen and their master. Seamen, while on duty, are subject to rigorous duty, and the opportunity of appeal for protection from an abuse of power is narrowly restrained. As is often stated:
"There is no other peaceful pursuit in which the dominion of the superior is so absolute and the dependence of the subordinate so complete, as in that of a sailor upon a vessel at sea. He binds himself by the contract of employment to serve the ship during the voyage, and desertion may *West Page 491 
be made an offense punishable by imprisonment. He owes obedience while on shipboard to his superior officers, and is bound to execute their lawful commands even at the risk of danger to his person or his life; and their right to enforce obedience by proper discipline and punishment has been recognized." Harris v. Pennsylvania Railroad Company, 4 Cir., 50 F.2d 866, 868.
We must concede that it is for these reasons that remedial legislation for the benefit and protection of seamen has been liberally construed to attain that end.
In the G.W. Glenn case, D.C., 4 F. Supp. 727, 729, 730, it was said:
"The duty to rescue a seaman overboard is a duty of the ship and of the owner under the general maritime law of the sea. `There is little doubt that rescue is a duty when a sailor falls into the sea.' Cortes v. Baltimore Insular Line, Inc., supra. `Equally clear is the obligation upon the part of the ship to save the life of a sailor who falls overboard through a misadventure, not uncommon in his dangerous calling. * * * it is implied in the contract that the ship shall use every reasonable
means to save the life of a human being who has no other source of help. The universal custom of the sea demands as much wherever human life is in danger. The seaman's contract of employment requires it as a matter of right.' * * * `There appears to be recognized a further duty on the part of a ship to its sailors, to make all reasonable efforts to rescue them if they falloverboard from any cause whatsoever. * * *' Bohlen's Studies in the Law of Torts, 312." (Italics mine).
In applying a given factual situation to our prevailing jurisprudence, rarely do we discover a case which, to the case at bar, is as a glove to the hand. The case of Harris v. Pennsylvania Railroad Company, supra, presents facts which I am unable to distinguish from those presented here. It may be said that the factual situation in the Harris case is not as strong as in the instant case.
The Harris case, supra, presented an action for damages brought by the administrator of the succession of a deceased seaman, whose death was caused by drowning whilst engaged as a deck hand and while performing his duties on a car float which was in tow of defendant's tugboat. The mate in command of the vessel was in the pilot-house and had a view fore and aft. The court found that he was able, within a few seconds, to step from the pilot-house to the side of the vessel, a distance of some 25feet. The accident occurred during the night time. The tug had cast off so that it could be made fast to the side of the float. The deceased was standing on the side of the float to receive the bow line from the tug, which was to be made fast to the float. Harris' co-employee, Sparrow, after explaining the method to be used, then went aft of the car float to fasten the stern line. When Sparrow arrived about midships, he heard a cry, looked back, saw Harris going into the water feet first with a lighted lantern. Sparrow called out to the tugboat, "man overboard", so as to prevent the tug from backing over Harris. Harris came up from beneath the water, 25 feet aft of Sparrow, as the latter stood amidships. The barge was moving ahead about 3 1/2 miles per hour. Sparrow went aft on the barge as quickly as he could and, when he reached the stern, he picked up a 6-inch hawser and threw it toward the man in the water. At that time Harris was 50 feet astern of the float, and the hawser was so heavy that it was not thrown more than ten feet. Nearby, there lay upon the deck a heaving line, estimated to be probably 48 feet in length, and, as the court commented, "which could have been thrown much moreeasily, but the fireman failed to use it." 50 F.2d 867. (Italics mine.) Being a good swimmer, Harris appeared to be swimming, or treading water. The court found that "no other effort was made to throw a line or other device to Harris while he was in the water". 50 F.2d at page 867. It also developed that, when Sparrow called out, "man overboard", the mate stepped out of the pilot-house, walked to the side of the boat, saw bubbles which might have indicated someone had fallen in. The court found that there was a life buoy kept near the pilot-house which the mate could have secured in three or four seconds, but that he made no attempt to do so.
In the meantime, the tug backed towards where Harris had fallen overboard, but he had disappeared.
At the close of plaintiff's case, a directed verdict was granted in favor of defendant on its motion. The reasoning of the trial judge was in effect that, even conceding it was the duty of defendant's employees to "do all that was reasonably possible to save the drowning man by throwing lines or buoys into the water" (50 F.2d 867), *West Page 492 
there was no evidence from which the jury could conclude that"more diligent action on their part would have saved theircomrade's life," (italics mine) the judge commenting that, even if additional steps had been taken, it was still a matter of speculation as to whether the deceased would have been able to avail himself so as to be saved.
In reversing the judgment, the court found that the evidence was sufficient to justify the submission to the jury of the issue of negligence. The court, in commenting on the facts and in referring to the mate leaving the pilot-house, concluded:
"* * * At this moment or shortly thereafter, the mate arrived at the side of the ship in close proximity to a life ring, but made no effort to throw it into the water because he could not see the man overboard. The mate knew that the man had just gone overboard, and it should have been obvious to him that the very occasion existed for which life rings are made and used. The fireman also, although making an effort in his excitement to throw overboard a 6-inch hawser which one man could not readily handle, failed to make any effort to use the heaving line nearby which he could easily have managed." 50 F.2d 869.
The court further concluded:
"These obvious facts lead us to conclude that there was evidence of neglect on the part of the crew, and further that it was for the jury to decide whether the man could have been saved if due diligence had been used. The deceased, even when last seen, was within 200 feet of the point at which a life ring, if promptly thrown, would have rested on the surface of the water. He was evidently making every possible effort to save himself. Whether in any event he would have succeeded is not a certainty, but in our view there was enough testimony tending to show a reasonable probability of rescue, had a life ring or heaving line been used, * * *". 50 F.2d at page 869.
In the case at bar, as previously stated, the similarity of the facts presented to those in the Harris case, supra, is so striking that a simple reading of these facts will make certain the impossibility of distinguishing one case from the other. In the case at bar the deceased fell from a ladder onto the deck and thence into the water. It is my appreciation of the law that why, or how he fell, is an irrelevant issue, and, at all events, could only be urged in mitigation of damages. At the time that he fell overboard, his co-employee, Edgecombe, was standing at a distance of from five to seven feet from a life ring. He saw Macomber strike the water, but made no effort to reach for the life ring and to throw it overboard. His failure so to do is explained to some extent by the fact that he "lost his head". A similar state of facts existed in the Harris case, where the co-employee, "in his excitement", threw a 6-inch hawser to reach a drowning man 50 feet away, when it could only be thrown a distance of ten feet. Applying the statement used in the Harris (50 F.2d 869) case, Edgecombe "knew that the man had just gone overboard, and it should have been obvious to him that the very occasion existed for which life rings are made and used". It is also shown that this life ring could have been reached and thrown into the water within a space of a few seconds. This is stated positively by the second assistant engineer. Even conceding that the tug was traveling 11 feet per second away from Macomber, the evidence discloses that he fell overboard near the smokestack, about 40 feet from the stern. It is further testified that a life ring can be thrown a distance of 35 to 40 feet. It is further shown that the tide was floating in the direction of the deceased and that, when he was seen on the surface of the water, he was swimming towards the boat.
These obvious facts lead me to conclude that, had Edgecombe exercised reasonable diligence and had done all that was reasonably possible to save the drowning man, the probability of rescue is most certain. Had he reached for a life ring, as he should have done, and had run to the stern of the boat, and thrown it overboard, the few seconds required for this effort would have been such that the deceased would have been within easy reach of this life ring, or that it would have floated on the surface towards the direction in which he was swimming, thereby affording him the opportunity of saving himself.
Instead of performing this plain, simple duty, a duty which is performed from instinct rather than from discretion, defendant's employee ran a distance of 55 to 60 feet to notify the pilot that a man was overboard; this, as he explains, to stop the engines and thus avoid the propellers from striking Macomber's body. It is obvious *West Page 493 
that, from the place where Macomber fell overboard and the distance that Edgecombe ran to give this notice, he should have readily realized, had he not lost his head, that by the time he would have reached the pilot-house and effected a stopping of the engines, moving at seven to nine miles an hour, or eleven feet per second, that such an effort would be vain and futile. It would have been futile for the very obvious reason that Macomber had passed the stern of the boat long before Edgecombe had given this notice and that any danger of being struck by a propeller would have long since passed.
The evidence further shows that the cry of "man overboard" had to be repeated, the engine pilot stating that he had not heard the first cry of Edgecombe. All of this time from the moment that Macomber fell into the water, the time consumed in running a distance of 55 to 60 feet, in calling to the attention of the pilot that a man was overboard, and in reversing the engines, during this entire time, the deceased was struggling in the water without any effort being made to effect some kind of rescue. The stopping of the engines may be termed an indirect attempt at rescue. The only effort made to effect a rescue in this instance was an attempt to lower the lifeboat. It is shown by the testimony of defendant's employees themselves that it took ten to fifteen minutes to lower this lifeboat and that Macomber had already drowned, even before the lifeboat had been lowered into the water.
In the case of Kirincich v. Standard Dredging Company, 3 Cir.,112 F.2d 163, 166, the court uses the language to be found in the Sea Scout Manual and which is somewhat applicable to the facts at bar, viz.:
"`Another type of life preserver often seen is the ring buoy. These are to be found attached to the rails and bridge combings of large vessels; on hooks against a deck house or secured to thestanding rigging on smaller boats; sometimes merely resting on the after-deck, in all cases ready for instant use. They are for use, when the cry "Man Overboard" goes ringing through the ship. It is the duty of the man nearest a life buoy to instantly toss it overboard, first securing the lemon, or bitter, end of the line attached to the ring, usually by placing his foot over the line. * * *
"`The man who has fallen overboard thanks to modern safety laws
stands a very good chance of again reaching his vessel. Even though not a swimmer the dire emergency of the situation will often enable a man to somehow fight to the life ring and clingon.' Sea Scout Manual, pp. 38-39." (Italics by U.S. Circuit Court.)
In the light of these facts, must we conclude that the taking of any further steps by defendant's employees would have been a vain and fruitless effort, a matter of speculation, there being no certainty that the deceased would have availed himself of these efforts and have saved himself?
In the Kirincich case, also, the court quoted approvingly from the doctrine announced in Zinnel v. United States Shipping Board B.F. Corp., 2 Cir., 10 F.2d 47, 49:
"`There of course remains the question whether they might have also said that the fault caused the loss. About that we agree no certain conclusion was possible. Nobody could, in the nature of things, be sure that the intestate would have seized the rope, or, if he had not, that it would have stopped his body. But we are not dealing with a criminal case, nor are we justified, where certainty is impossible, in insisting upon it. * * * we think it a question about which reasonable men might at least differ whether the intestate would not have been saved, had it been there.' * * *"
A unanimous verdict was rendered in the case at bar in favor of plaintiff. The jury heard and saw the witnesses testify in this proceeding. It has been a universal rule of our appellate courts, the soundness of which has never been questioned, that the finding of a jury or a trial judge on questions of fact should not be disturbed unless manifestly erroneous. I concede, however, the majority view that, where the trial court's finding, or that of the jury, on the question of fact and law is not responsive to the evidence, the appellate courts are fully justified, under our system of procedure, to render such judgment as will be in accordance with the true facts and law. However, I am firmly convinced that from the facts here presented, defendant's employees have been guilty of negligence and that that negligence was the proximate cause of the accident and for which liability should be imposed in accordance with the findings of the jury and the judgment of the lower court.
I respectfully dissent. *West Page 547