4 F.Supp. 727 (1933)
THE G. W. GLENN.
BROWN
v.
DONOHO et al.
No. 1380.
District Court, D. Delaware.
September 19, 1933.
*728 Ward & Gray, of Wilmington, Del., and George P. Whip, of Baltimore, Md., for libelant.
John Biggs, Jr., of Wilmington, Del., and Melvin Hopkins, of Dover, Del., for respondents.
NIELDS, District Judge.
This is a libel by Isaac R. Brown, Jr., ancillary administrator of the personal estate of Kirvan S. Phillips, deceased, against Benjamin Donoho and Hiram B. Donoho, as owners of the schooner or motorboat G. W. Glenn, to recover damages for the death of Phillips. It is filed under the provisions of the Merchant Marine Act of 1920, § 33, commonly known as the Jones Act [USCA title 46 § 688], and is based upon the alleged negligence of defendants.
April 14, 1930, Phillips, a sixteen year old lad of Cambridge, Md., was employed as a deck hand on the oyster schooner G. W. Glenn by her master, John R. Hardy. The Glenn was over 50 feet long and was equipped with sails, an auxiliary gasoline engine, and another gasoline engine called a "winder" with which to draw the oyster dredges aboard. The crew consisted of four seamen and a cook, including Phillips. The Glenn had been dredging a week and at sunrise on April 23, 1930, sailed from Mahon's Ditch back to Silver Bed on Oyster Rock in the Delaware river 1¼ miles from the Delaware shore. At 9 o'clock that morning the dredges were drawn aboard, and the crew had "early dinner" while the cook at the wheel held the schooner above the oyster bed. The weather was fair, the wind blowing north northwest, the tide ebbing, and the sea rather rough. About 9:20 the captain resumed the wheel and was bringing the schooner back for dredging. She was proceeding under full sail in a west southwesterly direction and making six knots an hour. Three of the seamen were on deck trimming oysters. Phillips was shoveling oysters aft on the port side of the schooner, and as he passed the port side of the wooden casing about the winder there was a loud explosion from the exhaust of the winder, and Phillips went over the low rail with his shovel into the river. Captain Hardy at the wheel faced Phillips. With apparent candor he explained the accident on the witness stand in these words: "Well, it could have been an urge of the sea, or made a misstep, or low railing, and it could have tripped him that way."
The only life-saving equipment provided by the owner was a lifeboat. As is customary, the lifeboat of the Glenn was suspended from davits overhanging her stern. At the time of the accident it was lashed to a davit so that the stern of the boat could not be lowered into the water. The lifeboat was raised or lowered by operating a rope or davit fall carried through the pulleys of 4 blocks  2 blocks at the bow and 2 at the stern. At the stern the upper block is hooked to the davit and the lower block is hooked to an eyebolt in the bottom of the lifeboat. This eyebolt in the bottom was missing and a loop of rope had been substituted. The rope loop was insufficient and unsafe. To secure the stern of the lifeboat after it was raised to the davit, the rope or davit fall was carried through a hole bored in the lifeboat and then carried around the davit and tied in a hard or "granny" knot.
With this equipment and a man overboard, Captain Hardy gave the usual alarm. He shouted to lower the jib. He threw a rope to the boy. He joined the three seamen and cook in a futile effort to lower the lifeboat. A seaman at the stern davit obtained a knife from the cook and cut the davit fall. The stern of the lifeboat then dropped within a foot of the water, but a knot in the rope jammed the pulley. With the bow of the lifeboat in the water and the stern suspended above the water, the boat capsized and a seaman in the boat with difficulty clambered aboard. However, the lifeboat had only half of one oar, so that if she had floated there was no equipment provided for navigating her. The schooner covered 100 yards before the captain headed her about. There was additional delay in lowering the sail and starting the auxiliary engine. Ten minutes elapsed before the schooner was back where the lad went overboard. When asked why it took ten minutes to get back, a seaman testified: "This fooling with the lifeboat and the sails too, and then we had to go down and start the engine." Meanwhile the "hollering" of Phillips was heard on board the schooner. He was a poor swimmer and was handicapped with very heavy clothing. After keeping afloat for three minutes or longer he sank, and his body was recovered some weeks later. When asked *729 whether there was not some one aboard that had the heart to get out after the boy, another seaman testified, "They had nothing to get after him with."
The libel charges that the death of Phillips resulted from an injury due to "negligence on the part of the respondents, their agents, servants and/or employees" in providing a lifeboat that was defective, improperly carried, and not supplied with adequate oars; in not providing life preservers; and in furnishing a gasoline engine for winding the oyster dredge so defective that "the head blew off and went through the wooden covering" so that one or more pieces of said covering striking the deceased caused him to go overboard. The libel also charges that the Glenn was in an unseaworthy condition. By their amended answer respondents (1) deny the charge of negligence, and (2) for further answer aver that at the time of the injury to Phillips respondents were not and never had been the beneficial owners of the Glenn, but were only mortgagees out of possession; that John R. Hardy was both master and beneficial owner hiring the crew and having sole use and control of the schooner. Both defenses will receive consideration.
Section 33 of the Jones Act (46 USCA § 688), under which the libel was brought, provides that in case of the death of a seaman, as the result of an injury in the course of his employment, his personal representatives may maintain an action for damages, and in such action, all statutes of the United States conferring or regulating the right of action for death in case of railway employees shall be applicable. The Federal Employers' Liability Act [45 USCA § 51] is such a statute and provides that every common carrier by railroad shall be liable in damages in case of death of the employee resulting in whole or in part from negligence of any of the officers, agents, or employees of the carrier. The Federal Employers' Liability Act makes negligence the basis of a railroad's liability. Section 33 of the Jones Act extends to the personal representatives of a seaman, incurring personal injuries in the course of his employment which result in his death, the rights accorded by federal law to railway employees. Section 33 of the Jones Act is the death statute affording relief to the beneficiaries of a seaman whose death results from an injury occasioned by negligence and suffered within a league of the shore.
Quite recently the Supreme Court has ruled that the Jones Act should be liberally construed. "The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure. * * * The act is not to be narrowed by refined reasoning or for the sake of giving `negligence' a technically restricted meaning. It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word may be read to include all the meanings given to it by courts, and within the word as ordinarily used." Jamison v. Encarnacion, 281 U. S. 635, 640, 50 S. Ct. 440, 442, 74 L. Ed. 1082. "This court has held that the act is to be liberally construed in aid of its beneficent purpose to give protection to the seaman and to those dependent on his earnings." Cortes v. Baltimore Insular Line, Inc., 287 U. S. 367, 375, 53 S. Ct. 173, 176, 77 L. Ed. 368.
The duty to rescue a seaman overboard is a duty of the ship and of the owner under the general maritime law of the sea. "There is little doubt that rescue is a duty when a sailor falls into the sea." Cortes v. Baltimore Insular Line, Inc., supra. "Equally clear is the obligation upon the part of the ship to save the life of a sailor who falls overboard through a misadventure, not uncommon in his dangerous calling. It is absurd to admit the duty to extend aid in the lesser emergency [seaman's illness], and to deny it in the greater. In both cases, it is implied in the contract that the ship shall use every reasonable means to save the life of a human being who has no other source of help. The universal custom of the sea demands as much wherever human life is in danger. The seaman's contract of employment requires it as a matter of right." Harris v. Pennsylvania Railroad Co. (C. C. A.) 50 F.(2d) 866, 868; Salla v. Hellman (D. C.) 7 F.(2d) 953. "There appears to be recognized a further duty on the part of a ship to its sailors, to make all reasonable efforts to rescue them if they fall overboard from any cause whatsoever. And it would appear that this is a not improper extension of the ship's duty. The very nature of the employment is one subjecting the sailor to grave risk of just such peril, and his helplessness and the master's ability to protect him, is manifest." Bohlen's Studies in the Law of Torts, 312. Mr. Justice Field, charging a jury in a manslaughter case back in 1864, said: "Now, in the case of a person falling overboard from a ship at sea, whether passenger or seaman, when he is not killed by the fall, there is no question as to the duty of the commander. He is bound, both by law *730 and by contract, to do everything consistent with the safety of the ship and of the passengers and crew, necessary to rescue the person overboard, and for that purpose to stop the vessel, lower the boats, and throw to him such buoys or other articles which can be readily obtained, that may serve to support him in the water until he is reached by the boats and saved. No matter what delay in the voyage may be occasioned, or what expense to the owners may be incurred, nothing will excuse the commander for any omission to take these steps to save the person overboard, provided they can be taken with a due regard to the safety of the ship and others remaining on board. Subject to this condition, every person at sea, whether passenger or seaman, has a right to all reasonable efforts of the commander of the vessel for his rescue, in case he should by accident fall or be thrown overboard." United States v. Knowles, 26 Fed. Cas. 800, 802, No. 15,540.
The duty of the ship and owner to rescue a seaman overboard necessarily implies the duty to provide the means of rescue. Normally these means include an effective lifeboat, available life preservers, or life rings. Applying this law to the facts, I find that the owner of the Glenn violated the provision of the Jones Act recited above by neglecting to provide proper means to discharge the duty to rescue Phillips.
It may be objected that the Federal Employers' Liability Act (45 USCA §§ 51-59) imposes its limitations upon the Jones Act and that the duty to rescue does not apply to railroads. Or it may be objected that the duty to rescue a seaman overboard arises from the seaman's contract of employment; such duty being contractual and not delictual cannot be within the act affording a remedy for negligence. The Supreme Court disposes of both of these objections in the following passages from Cortes v. Baltimore Insular Line, Inc., supra:
"We think the origin of the duty [cure of seaman] is consistent with a remedy in tort, since the wrong, if a violation of a contract, is also something more. The duty, as already pointed out, is one annexed by law to a relation, and annexed as an inseparable incident without heed to any expression of the will of the contracting parties. For breach of a duty thus imposed, the remedy upon the contract does not exclude an alternative remedy built upon the tort. The passenger in a public conveyance who has been injured by the negligence of the carrier, may sue for breach of contract if he will, but also at his election in trespass on the case. * * * We do not read the act for the relief of seamen as expressing the will of Congress that only the same defaults imposing liability upon carriers by rail shall impose liability upon carriers by water. The conditions at sea differ widely from those on land, and the diversity of conditions breeds diversity of duties. * * * There is doubt, and that substantial, whether the administrator of a railroad engineer who by misadventure has fallen from his locomotive while the train is on a bridge has a cause of action under the Federal Employers' Liability Act (45 USCA §§ 51-59) because of the failure of the crew of the train to come to the rescue of their comrade. Harris v. Penn. R. Co. (C. C. A.) 50 F.(2d) 866, 868. There is little doubt that rescue is a duty when a sailor falls into the sea, United States v. Knowles, 4 Sawy. 517, Fed. Cas. No. 15,540, and that a liability to respond in damages is cast upon the shipowners if he is abandoned to his fate. Harris v. Penn. R. Co., supra.
"The act for the protection of railroad employees does not define negligence. It leaves that definition to be filled in by the general rules of law applicable to the conditions in which a casualty occurs. * * * Congress did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. When this concurrence of duty, of negligence and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail."
The second defense arises from certain facts not unfamiliar in maritime dealings but somewhat misunderstood after this libel was filed. The records of the Custom House at Wilmington, Del., where she was registered, show that the schooner Glenn was conveyed December 22, 1928, by Z. S. Mears to John R. Hardy for a consideration of $2,800. On the same day a mortgage in like amount was given by Hardy to Mears. August 27, 1929, Hardy reconveyed the schooner to Mears. On September 6, 1929, a satisfaction of the mortgage from Hardy to Mears was recorded, and on November 21, 1929, Mears conveyed the vessel to the respondents, the consideration given in the transfer record in the office of the collector of customs being $5 and other valuable consideration. As to the circumstances *731 under which he became possessed of the schooner, Captain Hardy testified: "I bought her and did not pay for her. I had a mortgage on her. I wanted that mortgage lifted, and he did, and I could not lift it, and I did not have all the money, and I went to Donoho & Son and asked them if they would take this mortgage of $1800., which they did, to save me from losing mine, because I would have lost all, and they simply took a bill of sale on it to protect themselves, and they were in no benefit of the proceeds, I kept the balance of the money, and of course, I was to pay that back." Hiram B. Donoho, one of the respondents, testified that he loaned $1,800 to Captain Hardy to pay off the mortgage on the Glenn given by Hardy to Mears, such payment being necessary to save to Hardy the money he had already invested in the boat. "Jack was going to lose his money and that was all that he had in the world and I came to his rescue." Neither of the respondents engaged Hardy as master, hired any of the crew, furnished any of the food and supplies, or had anything whatever to do with her navigation and operation.
At the time of the accident the schooner was registered in the United States Custom House in Wilmington, Del. Incident to this registration a "Managing Owner's Oath," signed "Hiram B. Donoho, Managing Owner," and verified by him, was filed. This document recites that John R. Hardy "is at present Master" and that the schooner "is wholly the property of citizens of the United States of America owning and residing as follows: Benjamin Donoho, Dover, Delaware, Hiram B. Donoho, Dover, Delaware  Managing Owner." April 29, 1930, six days after the accident, a "report of casualty" was filed in the Custom House, signed by John R. Hardy. This report gives the name of the master as "John R. Hardy, Little Creek, Del.," and the names of the owners as "H. B. Donoho and Benjamin Donoho."
The libel was filed April 13, 1931. April 30, 1931, respondents filed their answer, verified by Benjamin Donoho. The libel having alleged in paragraph 2 that the respondents were "the owners of the auxiliary schooner or motor boat G. W. Glenn," the answer stated, "As to the allegations of the second paragraph of the said libel, the same are admitted." The answer concludes: "Wherefore, the said Benjamin Donoho and Hiram B. Donoho, owners of the said Glenn as aforesaid * * * pray that the said libel against them and against the said Glenn be dismissed," etc. Afterwards and before the case came on for trial, the respondents by leave of the court filed an amended answer with an affidavit of one of the proctors for respondents. The amended answer admits that the legal title to the schooner "is and was registered in the names of the respondents," but denies that respondents are "the equitable and beneficial owners" of the vessel. The affidavit of the proctor for respondents attributes the admissions in the first answer to the fact that respondents "did not inform him, until after the said answer had been filed, the said John R. Hardy, master of the `Glenn,' was a gratuitous bailee of him, the said Hiram B. Donoho, and that he had given the said `Glenn' to the said John R. Hardy without consideration for the balance of the oyster season."
It is clear that the Glenn was transferred to respondents by Hardy as security for a loan of $1,800 by the Donohos to Hardy to pay off a mortgage on the vessel, and that the Donohos took title to the vessel as security for the repayment of this loan. In other words, respondents were mere mortgagees out of possession. It is true that a bill of sale was given to the Donohos by Hardy and recorded and that on the records of the Custom House the Donohos appear as "owners." But the recording of the bill of sale in the Custom House was necessary whether it was an absolute transfer or as security. There must be some conduct other than the registry of title in their name to estop respondents to deny that they are owners. Morgan's Assignees v. Shinn, 15 Wall. 105, 21 L. Ed. 87; 24 R. C. L. §§ 100, 101.
The uncontradicted testimony is that Captain Hardy hired the members of the crew, including Phillips, equipped the vessel with food and supplies, received all income from the operation of the vessel, and was at all times in absolute possession and control of her. The proof establishes that Captain Hardy was sole owner of the Glenn.
The libel must be dismissed.