FOURNET, Justice.
 

 This is a suit to recover damages for the death of a seaman under the provisions of Section 33 of the Merchant Marine Act of 1920, 46 U.S.C.A. § 688, more commonly known as the Jones Act, and is now before us on a writ of certiorari to review the judgment of the Court of Appeal for the Parish of Orleans reversing a jury verdict and the judgment of the district court awarding the sum of $7,269.40 to Mrs. Lola Macomber as the administratrix of the estate of John B. Macomber, her late husband, and casting in damages the De Bardeleben Coal Company, Inc., owner of the tug boat “Clara,” on which steam tug the deceased was working at the time of his death.
 

 John B. Macomber lost his life on February 9, 1939, by drowning in a navigable stream, the Intercoastal Canal, at a point where the canal runs through Bay Wallace, while in the performance of his duties as a deck hand on the defendant’s tug boa.t “Clara,” then proceeding from Houston, Texas, to New Orleans, Louisiana. According to the version of the only eye witness, Leonard F. Edgecombe, another deck hand on the tug, the accident occurred while he and Macomber were engaged in cleaning or “soogeeing” the boat’s smoke stack. Macomber was doing the actual cleaning while standing on a ladder, and Edgecombe, as explained by the pilot, A. A. Smith, who could see them, “was passing soogee rags to him. In other words he would hand him a rag from a soogee bucket and then a rag from a rinse bucket. He was wringing water out of the rags and handing them to him. The two buckets were on deck, and they were changing rags backwards and forwards. He was holding the ladder at the bottom to keep the ladder from slipping any.” Suddenly, while descending the ladder in order to move it to the other side of the stack, Macomber missed a rung, and, losing his grip on the stay beside the ladder, fell backwards, hitting the deck on his buttocks; rolling under the guard rail running along the deck two feet above it, he fell into the water below. Edgecombe unsuccessfully attempted to grasp the deceased before he went overboard, but made no effort to throw him a life ring thereafter; instead, he ran 20 feet across the deck and up the opposite side 50 or 55 feet toward the wheel or pilot house, to apprise the pilot, Smith, the man in charge of the boat while the captain was off duty, of the accident by calling “Man overboard.” From the wheel house Edgecombe
 
 then
 
 proceeded to
 
 assist
 
 in the lowering of a life boat while the tug was being stopped. Smith signaled for the reversal of the engine on the port side and Captain Angelo, who was sleeping in the pilot house and was awakened by the calling of “Man overboard,” ordered the reversal of the other engine, on the starboard side. However, by the time the boat was brought to a full stop and the life boat lowered, some 10 or 15 minutes later, Macomber, who had been struggling in the water all of that time and swimming in the
 
 *640
 
 ■direction of the tug, disappeared from view. An effort was made to recover his body, which was later found by two fishermen employed by the captain for that purpose.
 

 Mrs. Lola Macomber, as the administratrix of her late husband’s succession, brought this suit seeking to recover from the defendant damages in the amount of $28,435.20. The basis of her action was the negligence of the defendant (1) in failing to furnish a safe ladder, (2) in furnishing an incompetent deck hand who not •only failed to do his duty of firmly holding the ladder on which Macomber was standing, but also failed to promptly throw him a life preserver after he had fallen ■overboard, and (3) in that the officers and crew of the tug boat failed to avail themselves of the equipment at hand in a reasonable effort to rescue her husband.
 

 In its answer, the defendant denied any negligence and averred that the accident was due solely to the negligence of Ma-comber in descending the ladder, and, in the alternative, pleaded Macomber’s contributory negligence.
 

 By a vote of two to one, the Court of Appeal for the Parish of Orleans reversed the judgment of the lower court, based on the unanimous verdict of the jury awarding plaintiff $7,269.40 in damages, being of the opinion that the evidence did not substantiate plaintiff’s allegation that the ladder was unsafe or that Edgecombe was incompetent, and being of the further opinion that the plaintiff had failed to prove that the throwing of a life preserver would have saved Macomber’s life. The defendant, adopting the conclusion arrived at by the majority of the Court of Appeal, is here urging this as its defense.
 

 The pertinent part of Section 33 of the Merchant Marine Act of 1920, 46 U.S.C.A. § 688, provides that “ * * * in case of the death of any seaman as a result of any such personal injury [suffered in the course of his employment] the personal represem tative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees [The Federal Employers’ Liability Act, 45 U.S. C.A. § 51] shall be applicable” (Brackets ours), and “ * * * the act is to be liberally construed in aid of its beneficient purpose to give protection to the seaman and to those dependent on his earnings.” Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 53 S.Ct. 173, 176, 77 L.Ed. 368. See, also, Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082; Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 428, 59 S.Ct. 262, 83 L.Ed. 265; Harris v. Pennsylvania Railroad Co., 4 Cir., 50 F.2d 866; The G. W. Glenn, D.C., 4 F.Supp. 727, and Armit v. Loveland, 3 Cir., 115 F.2d 308.
 

 “The duty to rescue a seaman overboard is a duty of the ship and of the owner under the general maritime law of the sea.” The G. W. Glenn, supra [4 F.Supp. 729]. See, also, United States v. Knowles, D.C., Fed.Cas.No. 15,540, 4 Sawy. 517. “There is little doubt that rescue is a duty when a sailor falls into the sea.” Cortes v. Baltimore Insular Line, Inc., supra. “Equally clear is the obligation
 
 *642
 
 upon the part of the ship to save the life of a sailor who falls overboard through a misadventure, not uncommon in his dangerous calling. * *
 
 *
 
 it is implied in the contract that the ship shall use every reasonable means to save the life of a human being who has no other source of help. The universal custom of the sea demands as much wherever human life is in danger. The seaman’s contract of employment requires it as a matter of right.” Harris v. Pennsylvania Railroad Co., supra [50 F.2d 868]. See, also, Salla v. Hellman, D.C.,
 
 7
 
 F.2d 953.
 

 In the Harris case the United States Circuit Court of Appeal for the Fourth Circuit said: “ * * * we have no doubt that
 
 a legal obligation rests upon a ship to use due diligence to save one of the crew, who, by his own neglect, falls into the sea; and that the owners are liable if, by failure to perform, this duty, his Ufe is lost.
 
 The reason is apparent when we consider the peculiar relationship of the seaman to his ship, which irrespective of statute, has been recognized from the earliest periocl. The general rules of master and servant apply] but they are modified by the nature of the business. The contract of employment involves not merely a surrender of the personal liberty of the seaman to a greater extent than is customary, Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715, but it imposes upon the employer an exceptional obligation to care for the well-being of the crew.” (Italics ours.)
 

 Amplifying the reason for this rule, the court continued: “There is no other peaceful pursuit in which the dominion of the superior is so absolute and the dependence of the subordinate so complete, as in that of a sailor upon a vessel at sea. He binds himself by the contract of employment to serve the ship during the voyage, and desertion may be made an offense punishable by imprisonment. He owes obedience while on shipboard to his superior officers, and is bound to execute their lawful commands even at the risk of danger to his person or his life; and their right to enforce obedience by proper discipline and punishment has been recognized. If he is taken sick or is injured on board the ship, or is cast into the sea by the violence of the elements or by misfortune or negligent conduct, he is completely dependent for care and safety upon such succor as may be given by the members of the crew. By reason of these conditions, the maritime law extends to mariners a protection greater than is afforded by the general rules of common law to those employed in service upon the land. From time immemorial, seamen have been called the ‘wards of admiralty’; and in this country as elsewhere the Legislature has enacted an elaborate system of legislation for their protection.” See, also, Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 428, 59 S.Ct. 262, 83 L.Ed. 265.
 

 The district judge, in the Harris case, directed the jury to dismiss the plaintiff’s suit, being of the opinion, as were the two judges of the Court of Appeal for the Parish of Orleans in the majority opinion in the instant case, “that even if additional steps had been taken, it was still merely a matter of speculation as to whether the deceased;
 
 *644
 
 would have been able to have availed himself of them so as to be saved,” but the United States Circuit Court of Appeal in reversing the district judge’s judgment, remarked that
 
 “The jury might well have concluded that a greater degree of diligence sho%ild have been exercised by the mate in charge of the vessel and by the fireman on the deck at the time.
 
 The deceased was an expert swimmer, and, when he came to the surface of the water, he was swimming or treacling water. He called out several times for the men on the barge to throw him a line. At this moment or shortly thereafter, the mate arrived at the side of the ship in close proximity to a life ring, but made no effort to throw it into the water because he could not see the man overboard.
 
 The ntate knew that the man had just gone overboard, and it should have been obvious to him that the very occasion existed for which life rings are made and used. The fireman also,
 
 although making an effort in his excitement to throw overboard a 6 inch hawser which one man could not readily handle,
 
 failed to make any effort to use the heaving line nearby which he could easily have managed.
 
 It is true that the heaving line was only abojit SO feet long and when the hawser was thrown, Harris was already SO feet from the stern of the vessel which was then slowly going ahead. But it is not easy to understand, notwithstanding the testimony of Sparrow to the contrary, why he could not have reached the stern of the vessel before it passed the man in the water. The vessel was only moving at the pace of an ordinary pedestrian, and an able-bodied seaman should have had no difficulty in reaching the stern before the vessel passed the man struggling in the water. The jury was not obliged to accept his [Sparrow’s] opinion that he went aft as soon or as fast as he could.” Continuipg the court said:
 
 “These obvious facts lead us to- conclude that there was evidence of neglect on the part of the crew, and further that it was for the jury to decide whether the man could have been saved if due diligence had been used.
 
 The deceased, even when last seen, was within 200 feet of the point at which a life ring, if promptly thrown, would have rested on the surface of the water. He was evidently making every possible effort to save himself.
 
 Whether m any event he would have succeeded is not a certainty, but in ou-r view there zvas enough testimony tending to show a reasonable probability of rescue, had a life ring or heaving line been used,
 
 to justify the submission of the question to the jury.” See, also, Kirincich v. Standard Dredging Co., 3 Cir., 112 F.2d 163, and Tompkins v. Pilots Ass’n for Bay and River Delaware, D.C., 32 F.Supp. 439. (All of the italics and the brackets in the above quotation are ours.)
 

 The Court of Appeal for Orleans Parish, in differentiating the facts in the instant case from those in the Harris case, said: “Here the boat was going much faster than a pedestrian walks and it would seem that there would have been a better chance to reach the drowning man with a life boat than with a life preserver which, according to the evidence, could only be thrown about thirty-five feet.”
 

 The tug boat “Clara” is about 100 feet in length with a beam of 21 feet. From where Macomber fell into the water, it is
 
 *646
 
 same 40 feet to the stern of the boat. At the time of the accident the boat was traveling about
 
 7
 
 miles an hour (approximately twice as fast as the ordinary pedestrian walks) through the channel of the Inter-coastal Canal, 100 feet wide and navigated by means of beacons stationed along the edge of the channel, which at the point where the accident occurred, runs through Bay Wallace, about 600 or 800 feet wide at that spot. According to all of the witnesses, it took from 10 to 15 minutes to stop the tug and it was not until it was stopped that the life boat was lowered. About the time the life boat reached the water, Macomber, who had been struggling in the water all of that time, disappeared from view. These facts, in our opinion, furnish their own example of the fallacy of the reasoning of the Court of Appeal, for it goes without saying that if a man dressed as heavily as Macomber was described to have been dressed could swim well enough to remain afloat during that period of time (10 or 15 minutes), he would certainly have experienced no difficulty in the meantime of reaching a life preserver that (had one been thrown anywhere within a reasonable distance of him immediately) would have drifted in his direction, since a tide of from 2 to 4 miles an hour was running against the boat and toward him. Moreover, the law does not leave any discretion to the officers and crew of a boat in cases of such emergency. It was Edgecombe’s duty, upon seeing Macomber fall overboard, to immediately toss or throw him a life ring. His failure to do so constituted negligence under the Jones Act and the jurisprudence of the federal courts thereunder (Kirincich v. Standard Dredging Co., 3 Cir., 112 F.2d 163, and Tompkins v. Pilots Ass’n for Bay and River Delaware, D.C., 32 F.Supp. 439), by which our courts are bound. Saloy v. City of New Orleans, 33 La.Ann. 79; Jones v. Kansas City So. Ry. Co., 143 La. 307, 78 So. 568; Walker v. Iowa Cent. Ry. Co., D.C., 241 F. 395; Engfors v. Nelson S. S. Co., 131 Or. 108, 280 P. 337; and other authorities too numerous to mention.
 

 The Sea Scout Manual, as was pointed out in Kirincich case [112 F.2d 166], requires that the ring buoy type of life preserver “ * * * be * * . * attached * * * on hooks against a deck house or secured to the standing rigging on * * * boats [of the type of the “Clara”] * * * ready for instant use * * * when the cry ‘Man Overboard’ goes ringing through the ship.” (Brackets ours.) Continuing, the manual aptly declares that “It is the duty of the man nearest a life buoy to instantly toss it overboard * * The necessity for and the wisdom of these provisions is shown by the further comments in the manual 'that “The man who has fallen overboard thanks to modern safety laws stands a very good chance of again reaching his vessel. Even though not a swimmer the dire emergency of the situation will often enable a man to somehow fight to the life ring and cling on.” Pages 38 and 39 of the Sea Scout Manual.
 

 In the Tompkins case, supra, Littleton, a good swimmer, fell into the sea at night in full sight of those on board. A search light was immediately turned upon him and, while a skiff was being lowered, two life rings or preservers of the ordinary type were
 
 *648
 
 thrown from the bridge to him. They fell into the water within a few feet of Little-ton, but it appears that he did not see them, as he made no effort to reach them. As the skiff, which had been lowered in the meantime, was approaching him, less than 10 minutes after he fell into the water, he suddenly sank without a struggle. On the boat, and within easy reach, were luminous rings which were intended for use at night because they would flare brightly when they struck the water. Testifying before the jury, the captain stated that he did not use these rings for the reason that he did not consider it necessary, since Littleton was plainly visible from the ship because of the beams from the search light playing about him. The court held that this amounted to inexcusable negligence, declaring that “the captain was. not confronted with a choice between two different incompatible methods of rescue (Johnson v. United States, 2 Cir., 74 F.2d 703), in which case an error of judgment might not imply negligence. In this case
 
 there was one thing which could easily have been done and which was not done, and the jury could properly find from the evidence that it was the omission to do that one thing which caused Littleton’s death’’
 
 [32 F.Supp. 441.] (Italics ours.)
 

 In the Kirincich case, Kirincich, a deck hand standing near the rear of a derrick barge that was being towed to a pier, either fell or was thrown overboard and was being carried away by the tide that was running out. He even called “Goodby fellows,” as he disappeared. His fellow deck hands instantly threw heaving lines an inch in diameter in his direction, some of the casts reaching within two feet of the spot where Kirincich was last seen struggling in the water; but he never grasped the
 
 lines;
 
 his body was later recovered. On a shelf in front of the wheel of the launch towing the barge, and therefore much farther away from Kirincich than they were from Macomber in the instant case, were several life preservers. These were never thrown.
 

 The United States Circuit Court of Appeals for the Third Circuit held that it was immaterial whether Kirincich had carelessly slipped or had been precipitated into the water by a bump, since, “To the duty of rescue there is no defense of contributory negligence,” and remanded the case to the lower court “for the entry of an interlocutory decree fixing the respondent’s liability, to be followed by the determination of the damages to which the libelant is entitled, and the entry of a final decree pursuant to such determination.” During the course of the opinion,
 
 the court, answering its own question “ *
 
 * *
 
 wotdd Kirincich have drowned even if a larger and more buoyant object than the inch heaving line had been thrown within tzvo feet of him? ” made the very pertinent observation that “If he could szmm, even badly, there would be no doubt.
 
 Assuming he could not, we think he might (the appropriate grammatical mood) have saved himself through the help of something which he could more easily grasp. We can take judicial notice of the instinct of self-preservation that at first compensates for lack of skill. A drowning man comes to the surface and clutches at what he finds there — hence the significance of size and buoyancy in life saving apparatus.” (Italics ours.)
 

 
 *650
 
 Thus it may be seen that it was Edgecombe’s duty to immediately toss or throw a life ring to Macomber and that his failure to do so was not only inexcusable, but constituted negligence. Whether or not Ma-comber would (or might) have been saved had Edgecombe and the other members of the crew performed their duty in that respect was a question for the jury’s decision under the facts of the case as presented to them, and, unless the conclusion reached by the jury was manifestly erroneous, the Court of Appeal was not warranted in reversing the jury’s verdict. This is in keeping with the rules of the federal courts in admiralty cases, as will be found expressed in the case of Lillig v. Union Sulphur Co., 9 Cir., 87 F.2d 277, 278: “Although an appeal in an admiralty case is regarded as a trial de novo, the findings of the trial court will not be disregarded by the appellate court where supported by competent evidence.
 
 Where the findings are made on conflicting evidence and the trial court has seen and heard the witnesses and has had an opportunity of judging their credibility, the findings are entitled to great weight and should not be upset, except for manifest error or unless it is shown that they are clearly wrong.”
 
 (Italics ours.)
 

 Unquestionably, in reviewing the evidence, the jury was not bound by the conclusions of the several witnesses for the defendant that it would have been futile for them to have thrown a life preserver to Macomber, particularly in view of the fact that these conclusions were not supported by any sound or. logical reasons. Moreover, in many respects the witnesses contradicted each other, in other respects some of the witnesses contradicted the statements of other witnesses, and in not a few instances the witnesses were themselves impeached by their own testimony given before the Marine Investigation Board in New Orleans on February 11, 1939, only two days after the accident occurred.
 

 The reason Edgecombe says he didn’t throw a life preserver to Macomber immediately after he fell overboard but instead went to the wheel or pilot house to apprise the pilot of the accident was because he wanted “to stop the engine, because I was afraid the wheel would hit him.” Yet, according to the testimony in the record, it is obvious that by the time he reached the wheel house, and certainly long before the tug was stopped, his fear would have been an accomplished fact (as a matter of fact, the wheel or propeller never did hit Macomber, for Smith, who examined his body after it was found, testified that Macomber could not have been hit by the propeller, as there was not a single mark on him anywhere), for at that time Macomber was seen struggling in the water and swimming toward the boat, a distance of some 300 feet away.
 

 Edgecombe did not testify before the jury, but his testimony before the Marine Investigation Board, taken two days after the accident occurred, and also his testimony before the Commissioner in Admiralty at New Orleans, taken two months before this suit was filed, was read to them, as was the testimony of all of the other officers and members of the crew of the “Clara” taken before these federal
 
 *652
 
 authorities. The Captain of the tug boat, Edward J. Angelo, did testify before the jury, and, when asked on direct examination "Why, didn’t you throw the life ring '[near his own hand] to Macomber?” (brackets ours), he replied, “Well, because my duties were to stop the engine right away to throw it full astern to try to stop the motion,” and when asked “Why didn’t you order someone to do it at that time ?” he replied,
 
 "It was too late at that time.”
 
 On cross-examination, however, he said, in answer to the query “wasn’t it Edgecombe’s job to throw a life ring over?” that
 
 “the boy lost his head, he was all excited.”
 
 And in answer to the question as to whether or not it was Edgecombe’s duty to throw him a life ring instantly, he said that “it wouldn’t have saved the boy if you had seven dozen life rings.” In an effort to justify Edgecombe’s failure to throw a life ring immediately after Ma-comber fell overboard, which life ring was only a few feet away, the Captain said: “You see by the time the boy grabbed for this boy to try to save him when he went over the side, it took
 
 a couple of minutes
 
 to get the life ring off the rail and to get it over to him and by that time the boa!t would have been a good distance away. When you fall overboard from the stern of a boat, you stay down there a little while before you come up, with that suction.” (All of the italics are ours.)
 

 On the other hand, Wurtz, the only other member of the crew testifying before the jury, estimated on direct examination that it would have taken Edgecombe
 
 approximately one minute
 
 to have taken down the life preserver and thrown it to Macomber. However, under cross-examination, he testified that if a man did not lose his head and become excited, that he could take the life preserver down much faster than a minute; when pinned down, he admitted that it could be done in only a few seconds. Furthermore, this same witness admitted that if a life preserver had been thrown to Macomber while he was struggling in the water that it might have gotten to him and have saved his 'life,’as the tide was running in his direction and he was swimming toward where the life preserver would have landed had it been thrown.
 

 Let us now consider Smith’s testimony. He testified before the Commissioner in Admiralty in December of 1939 that it would have been a vain and useless effort for Edgecombe to have thrown a life preserver to Macomber. It is interesting to note, however, that when this same witness was testifying before the Marine Investigation Board two days after the accident, in answer to the question propounded to him by one of the members of the board “Was there any reason why they [the life preservers or rings] were not thrown?” he replied: “The only way I could tell was that
 
 it was neglect
 
 of the man on the back there to throw them. There are two hanging right over where he went overboard.” And again to the question
 
 "That was neglect on the part of the deck hand Edgecombe?” he replied, "Yes, sir,
 
 Edgecombe could have thrown a life ring. If he had thrown a life ring and he could have hollered ‘man overboard’ from the stern of the boat, but instead of that he ran all the way over the side of the deck up to the
 
 *654
 
 side until he got abreast of the wheel house before he hollered ‘man overboard.’ ” Again when testifying before the Commissioner in Admiralty he stated that the life preservers were only 7 feet away from Edgecombe and that there would have been no difficulty in taking one down, stating that all Edgecombe would have had to do would have been to lift it off the hook and throw it instantly into the water, but instead of doing that he had run across the deck, a distance of 20 feet, then up the starboard side of the tug to the front of the wheel house, a distance of approximately 50 or 55 feet more, and then hollered '‘Man overboard.” When asked why Edgecombe didn’t throw the life ring instantly, he said “He just didn’t think about it I guess.” Questioned: “He overlooked it?” he answered “Overlooked it.” Further analyzing his testimony before the admiralty commissioner, we find Smith stated that after he was informed of Macomber’s fall overboard he stopped one of the engines, telegraphed a reversal signal to the engine room, threw his wheel hard to the left [running the tug aground] and then looked out and saw Macomber struggling in the water, swimming toward the boat. He also stated that if a life ring'had been thrown it naturally would have floated toward Macomber because there was a tide running against the boat and in Macomber’s direction of from 2 to 4 miles an hour. Smith further testified that if he had understood Edgecombe the first time he called “Man Overboard,” he [Smith] “could have thrown one [a life ring] from the back of the wheelhouse. There are two of them there.” (All of the italics and brackets are ours.)
 

 From these facts we cannot say that the unanimous verdict rendered in favor of the plaintiff by the jury who heard these witnesses and considered all of this evidence was manifestly erroneous. In fact, we think the evidence fully justifies their verdict, for, under the jurisprudence, it is not required that the plaintiff prove the certainty of the success of the efforts of the crew to save a seaman who falls overboard, but rather, that the testimony tend “to show a reasonable probability of rescue.”
 

 For the reasons assigned, the judgment of the Court of Appeal is set aside and the judgment of the district court is affirmed; all costs to be paid by the defendant.
 

 O’NIELL, C. J., dissents.