96 F.Supp. 234 (1951)
BOCHANTIN
v.
INLAND WATERWAYS CORP. et al.
No. 6399(2).
United States District Court E. D. Missouri, E. D.
February 20, 1951.
*235 Harry Gershenson, Wilder Lucas, and Sullivan, Finley & Lucas, all of St. Louis, Mo., for libelant.
Drake Watson, U. S. Atty., of New London, Mo., and William V. O'Donnell, Asst. U. S. Atty., of St. Louis, Mo., for respondents.
HULEN, District Judge.
This is an action in admiralty, libelant, as guardian of the minor children of Roman P. Bochantin, brings this action for death of the father resulting from drowning, basing her right to maintain the action on the Missouri death statute. Respondent is a corporation whose stock is wholly owned by the United States and is engaged as a common carrier by water. The barge involved in the case was operated and controlled by respondent in furtherance of its business.
As the case now stands on the pleadings and the proof, libelant to recover must show:
(1) that respondent as shipowner owed to the deceased, an employee of a shipper, the duty to furnish a seaworthy vessel, with respect to a barge moored to the shipper's dock on a navigable stream, being loaded with grain, in which operation deceased was engaged;
(2) that failure to equip the barge with life-saving equipment rendered the barge non-seaworthy;
(3) that failure to have life-saving equipment aboard the barge was the proximate cause of death of libelant's husband when he fell overboard.
The contentions of respondent based on contributory negligence and assumption of risk are not serious. These claims are valueless as defenses in an admiralty action for death due to a ship's unseaworthiness. Contributory negligence goes only to mitigation of damages. Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075.
Respondents moved a grain barge to the dock of the Norris Grain Corporation on *236 the Missouri shore of the Mississippi River at St. Louis. The day of movement, or shortly thereafter, while Norris Grain Company was loading the barge with grain, the deceased, an employee of Norris Grain Company, was directed to go on the barge to help close a hatch. Deceased, standing by the side of the hatch on a runway between the edge of the barge and the hatch, was trying to pry the hatch cover to a closed position. Immediately thereafter deceased was seen in the water. The exact cause of his fall from the barge is not known. There was no railing at the edge of the barge. There was testimony that such railing is not practical in the operation of barges and are not in use. The runway from which deceased fell extended the length of the barge and was five feet wide. It was raining and the runway was wet. Deceased went into the water at about the center of the barge. The barge was 280 feet long. About the time deceased went into the water there was a cry of man overboard, and he was seen in the water by a number of employees of Norris Grain Company, three or four feet from the barge. The current of the river carried him south, approximately parallel to the barge. He remained afloat until he was some fifty feet south of the barge. There was no life-saving equipment of any kind on the barge. The barge was being loaded with grain from spouts extending from elevators on the shore out over the barge. There was a rope attached to the end of these spouts to pull them into position. One of the workmen attempted to throw this rope to the deceased but without success. There was testimony that when these barges are equipped at the boatyard they have life floats at each end.

(1)
The case of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 879, 90 L.Ed. 1099, is decisive on the principal law issues presented by the record in this case. The only difference in the facts is, in this case deceased was not a regular stevedore or employee of a stevedore company, as was the situation in the Sieracki case. In both cases the deceased was not an employee of the shipowner. In the Sieracki case libelant received injuries and Bochantin in this case died, while engaged in loading the ship. Loading a ship is a part of the ship's service and liability is not affected because the ship is moored to a dock. As we read the Sieracki case, the business of the employer is not controlling. The liability is not furthered or limited by contract. Liability arises by reason of the hazards of marine service, which ship unseaworthiness places on the men who perform it and who are "helpless" to ward off such perils. Ship seaworthiness is an absolute duty to all within the range of this humanitarian policy. It extends to those who perform the ship's service with consent of the owner. Impliedly deceased had the owner's consent to close the hatch cover in the loading operation. Deceased's employer had agreed to do the loading operation as a part of the transportation contemplated. In the Sieracki case we find strong emphasis that to adopt a different rule from that there announced would permit a shipowner to avoid his responsibility, by contracting with a third party to perform ship's services. Such reasoning has a limited application to this case. The distinction, however, loses its importance in the light of the broad conclusion reached by the Court and the interpretations that have been given the opinion since it was announced. The Court said in the Sieracki case: "Running through all of these cases, therefore, to sustain the stevedore's recovery is a common core of policy which has been controlling, although the specific issue has varied from a question of admiralty jurisdiction to one of coverage under statutory liability within the admiralty field. It is that for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards."
There is language in the case of Lauro v. United States, 2 Cir., 162 F.2d 32, that would seem to qualify the Sieracki case. The Court, speaking through Clark, J., *237 said: "But when the owner surrenders control of any part of his ship to a stevedore in charge of loading and unloading, his duty of seaworthiness as to the part surrendered extends only up to the time the stevedore assumes control. Grasso v. Lorentzen, 2 Cir., 149 F.2d 127, 129, certiorari denied 326 U.S. 743, 66 S.Ct. 57, 90 L.Ed. 444." 162 F.2d loc. cit. 34.
But the Court goes on to say: "If therefore the agents of the stevedore, while he is in such control, create an unsafe condition where none existed before, the shipowner is not liable for accidents resulting therefrom." 162 F.2d loc. cit. 34.
This latter quotation gives the key to the type of case which does not come under the doctrine of the Sieracki case; that is, actions where control is surrendered to the stevedore and the unseaworthiness or negligence charged results from some act or omission of an employee of a third party who was not present when control is taken.
Some cases have seen fit to restrict application of the Sieracki case and exclude from its application employees of independent contractors engaged in repairing the ship. See Lynch v. United States, 2 Cir., 163 F.2d 97; Cioffi v. New Zealand Shipping Co., D.C., 80 F.Supp. 98. In Fine v. United States, D.C., 66 F.Supp. 768, a shipyard employee did not come within the category of "seaman" since the hazards involved in his calling were not the hazards of a "seaman". But in Bow v. Pilato, D.C., 82 F.Supp. 399, a cannery laborer was ordered to go on the vessel, which was jointly owned by his employer and several individuals, to repair the engine of the boat. It was held that since he was performing a maritime duty he was entitled to a maritime status in recovering from the owners of the boat. And in Sulovitz v. United States, D.C., 64 F.Supp. 637, it was held that a carpenter performing the duties of a ceiler, preparing the ship for the receipt of cargo, was within the rule of the Sieracki case.
We reach the conclusion the duties involved would have to approximate those of a seaman or stevedore, engaged in ship service, before the workman would be entitled to recover under the Sieracki doctrine, as now applied by the Circuit Courts, leaving it to the Supreme Court to make drastic extensions of the rule if their opinion was so intended. In this case the duties of deceased were substantially those of the ship's service, or a stevedore, and by allowing him to come within the rule of the Sieracki case we are not going beyond the boundaries set up by the Circuit Courts, supra. Nor does the fact the decedent was not regularly employed to load the barge control. Bow v. Pilato, supra.

(2)
Libelant charges unseaworthiness in many particulars. They have now been reduced to: "The barge was unseaworthy, in that it failed to have placed on it by respondents, and failed to be equipped with life-saving equipment, although respondents knew that persons loading said vessel would be required to work on same while afloat in the Mississippi River."[1]
In this case we have a barge, used for carrying grain, moored to the dock of deceased's employer. It was operated by defendant as a tow with a tug. No tug was present at the time deceased fell overboard. By contract the loading operations were performed by the shipper, the unloading operation by the consignee. During loading and unloading the barge was out of control and supervision of the owner. Under these circumstances respondent claims it was under no duty to furnish life-saving equipment and its absence did not render the barge unseaworthy.
Libelant cites Carlisle Packing Company v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927, which case we do not consider in point as there the vessel was self-propelled and carried inflammable cargo, and such vessels are by statute required to be equipped with life-saving gear; also Norfolk *238 Southern R. Co. v. Foreman, 4 Cir., 244 F. 353, where the deceased was caused to fall from the runway near the edge of the barge when the barge was struck by a tug in attempting to make fast preparatory to moving the barge, and which we do not consider persuasive in this case as recovery was based on (a) negligent striking of the barge by the tug with extraordinary force, and (b) failure to use reasonable effort to save the deceased; also The Carson, 9 Cir., 104 F.2d 762, which bears little resemblance to this case as death there came to a fireman who had gone temporarily insane, on a self-propelled dredger in the course of a voyage, and while in such mental condition had jumped overboard and refused to accept floats thrown to him, and no life boat was available to save him in spite of his condition.
In our opinion the case of Sadler v. Pennsylvania R. Co., 4 Cir., 159 F.2d 784, 786, while under the Jones Act, and recovery was sought based on negligence, is nevertheless authority for libelant's position. In that case two car barges were moored to a dock. Deceased was a cook on one of the barges. The barges were about 350 feet in length. No one saw the deceased fall, but when discovered he was in the water between the barges, calling for help and treading water. He continued to call for help for several minutes, during which time a line was thrown to him but it was too light and the wind carried it beyond his reach. A heavier rope was found but by that time deceased was unable to grasp the rope. There were life rings and preservers in the crew's quarters and on the bridge but both of these locations were thirty feet above the deck. Holding defendant negligent for failure to have adequate life-saving equipment readily available on the decks of the barges, the Court said:
"The duty of the ship and owner to rescue a seaman overboard necessarily implies the duty to provide the means of rescue."
"* * * it is of the utmost importance that life saving equipment be placed where it will be needed and where in case of the excitement of an emergency such as existed here it will not be overlooked."
In some of the cases we have been referred to, recovery was sought on the basis of negligence and in some of the cases in admiralty the doctrine of negligence is introduced. A shipowner's liability for unseaworthiness has been said to be a species of liability without fault and is not limited by conceptions of negligence. Facts which may show negligence may also sustain a charge of unseaworthiness. But the converse is not true. The vessel may be unseaworthy without negligence upon the part of the shipowner.
The facts which form the basis of the ruling in the Sadler case, to mention only one, are sufficiently similar to the facts in this case to constitute an authority for the conclusion that the barge furnished by respondent, and from which deceased fell, was unseaworthy because of failure to have any life-saving equipment aboard. That the Sadler case was under the Jones Act and founded on negligence does not alter this conclusion.

(3)
Was the unseaworthiness of the barge the proximate cause of the deceased's death? This is a question of fact. Employees at the scene of the death, and who testified, were in most instances unable to give a clear and correct account of exactly what happened. Clarence Sears, Superintendent of the Burlington Grain Elevator, was on the dock and testified that after Bochantin got in the water he (Sears) cried to the man below (we assume he meant those on the barge) to throw a rope  "and the only rope we had was the one attached to the spout  I think they are around fifty or sixty feet long, and some of them threw the rope but it didn't reach him". This witness testified he was looking at Bochantin when he went overboard and saw him go into the water, and that he came up ten or fifteen feet from where he went in and immediately started to swim toward the south (downstream). Edgar Morris, a fellow employee, saw Bochantin in the river, and "hunted for something to try to help the man and there was nothing to help him with". At the time he first saw Bochantin in the water he was *239 some six feet from the barge. Another fellow employee, Ted Lloyd, testified he was holding the spout rope; that he saw Bochantin in the water about fifteen feet "out from the barge" and about 25 feet south; that he was "fighting the water when I seen him, trying to swim"; that he "tried to get my rope out there, but it was tangled at the bottom". William Day, another fellow employee, asked if an effort was made to save the deceased, replied 
"A. There wasn't very much we could do.
"Q. Why? A. There was nothing to do with."
Lee Robins, an eye witness testifying on behalf of respondents, stated he saw Bochantin fall in the water and followed him as he was carried downstream to the end of the barge.
While the evidence on this phase of the case is meager, reflecting the probable excitement of the occasion, the following conclusions from it are justified: The deceased fell in the river near the center of the barge. He could swim and on falling immediately came to the surface. He continued on the surface of the river half the length of the barge and approximately fifty feet beyond, and within a distance of six to twenty-five feet of the barge. Had life-saving equipment been available it could have been thrown to him. That the situation was such as to call for this action follows from the testimony of Mr. Sears who "hollered to the man down below to throw him a rope", as well as other testimony to like effect. We cannot say with absolute certainty that had life-saving equipment been available the life of Bochantin would have been saved. Such proof could not be made in any like case. But we think the facts sustain our conclusion, the absence of life-saving equipment was the proximate cause of death.
In the case of Macomber v. De Bardeleben Coal Co., 200 La. 633, 8 So.2d 624, 628, the Court said: "`Whether in any event he would have succeeded is not a certainty, but in our view there was enough testimony tending to show a reasonable probability of rescue, had a life ring or heaving line been used, to justify the submission of the question to the jury.' See, also, Kirincich v. Standard Dredging Co., 3 Cir., 112 F.2d 163, and Tompkins v. Pilots Ass'n for Bay and River Delaware, D.C., 32 F.Supp. 439."
In the Kirincich case, supra, the decedent was twenty yards from the end of the barge when deck hands began throwing lines at him. At one time a line landed two feet from him; however, the tide carried him out of reach of the lines. In ruling, the failure to have life preservers on the barge was the proximate cause of the drowning, the Court said: "* * * would Kirincich have drowned even if a larger and more buoyant object than the inch heaving line had been thrown within two feet of him? If he could swim, even badly, there would be no doubt. Assuming he could not, we think he might * * * have saved himself through the help of something which he could more easily grasp. We can take judicial notice of the instinct of self-preservation that at first compensates for lack of skill. A drowning man comes to the surface and clutches at what he finds there  hence the significance of size and buoyancy in life saving apparatus." 112 F.2d loc.cit. 164. (Emphasis added.)
In Harris v. Pennsylvania R. Co., 4 Cir., 50 F.2d 866, 867, a man fell off of a barge which was going three to four miles per hour. By the time a fellow seaman arrived at the rear of the barge, he was about fifty feet off the end of the barge. This seaman threw the drowning man a heavy hawser which could have been thrown only about ten feet. The mate who was in the pilot house completely neglected to throw decedent a life ring which was on the pilot house. The decedent was an excellent swimmer. The Court reversed the District Court which had taken the case from the jury on the ground, there was no evidence of a showing of proximate cause.
It was broad daylight. It had been raining and the deck was wet. What caused deceased to fall overboard is wholly a matter of conjecture. That he slipped on the wet deck is the most probable. There is no evidence he was drunk, engaged in any kind of levity, or desirous of committing *240 suicide. Contributory negligence, as a matter in mitigation of damages, is not present.

(4)
Recovery under the statute and case law, on behalf of the children of deceased, is limited to fair and reasonable compensation to them for loss of their father's support, maintenance and education, during their minority. The father was 35 years of age, earning $55 a week. The two children are now ten and six years of age. One would have a claim for support for eleven years and the other for fifteen years. The death statute qualifies recovery "having regard to the mitigating and aggravating circumstances attending" the default, etc. We find no aggravating circumstances. That there are no mitigating circumstances results from operation of law. The prime fault leading to the death of Bochantin was the failure of his employer to take the usual precautions of requiring their employees to wear life preserver coats, as is customary on barges of this character. The employer's negligence does not relieve respondent. Respondent's liability results from extending to one engaged in the work deceased was doing the protection that originated because of dangers surrounding the work of those who went to sea in a ship's crew  a situation that bears little resemblance to that at the scene of deceased drowning, except to the extent decisions of our highest Court have made it so. We conclude recovery should, at least, be to the extent, it is possible to contemplate, the minor children would have benefited in a reasonable and necessary pecuniary manner at the instance of their father until their majority, considering their station in life. We conclude a fair estimate would be Forty Dollars ($40) a month, as an average expenditure, for the purposes noted, for each of the two children during their minority. Accordingly judgment will go for libelant for the sum of Twelve Thousand Four Hundred Eighty Dollars ($12,480).
Let the parties settle findings of facts, conclusions of law, and judgment, accordingly.
NOTES
[1] There is argument in libelant's brief that recovery is sought because "of the negligence of respondents in failing to furnish decedent a safe place to work on said vessel." Failure to provide a safe place to work is not pled in the complaint, aside from its relation to unseaworthiness.